1              UNITED STATES DISTRICT COURT

2                DISTRICT OF SOUTH DAKOTA

3                   WESTERN DIVISION

4
    *    *    *    *    *    *    *    *    *    *
5   UNITED STATES OF AMERICA,        CR 08-50079-02-LLP

6                     PLAINTIFF,   APRIL 15, 16, 2010
        VS.                        RAPID CITY, SOUTH DAKOTA
7
    VINE RICHARD MARSHALL, a/k/a,
8   RICHARD VINE MARSHALL, a/k/a
    DICK MARSHALL,
9
                      DEFENDANT.
10  *    *    *    *    *    *    *    *    *    *

11

12            PARTIAL TRANSCRIPT OF JURY TRIAL
              TESTIMONY OF ARLO LOOKING CLOUD
13
         BEFORE THE HONORABLE LAWRENCE L. PIERSOL,
14        SENIOR UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16
    FOR THE PLAINTIFF:  ROBERT MANDEL, ESQ.
17                      Assistant United States Attorney
                        District of South Dakota
18                      #201 Federal Building
                        515 Ninth Street
19                      Rapid City, South Dakota 57701

20                      ROD OSWALD, ESQ.
                        State of South Dakota
21                      Office of Attorney General
                        Assistant Attorney General
22                      2046 Samco Road
                        Rapid City, South Dakota 57709
23
    FOR THE DEFENDANT:  DANA HANNA, ESQ.
24                      Attorney at Law
                        P.O. Box 3080
25                      Rapid  City, South Dakota 57709

                   JUDITH M. THOMPSON
          (605) 348-8610    FAX  (605) 343-6842

1   COURT REPORTER:      JUDITH M. THOMPSON, R.P.R.

                           Official Court Reporter

2                      909 St. Joseph Street

                      Suite 505

3                      Rapid City, South Dakota 57701

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Bring in the jury, please.
 2              (Following proceedings in the presence of the
 3    jury.)
 4              THE COURT:  Bring in the next witness.
 5              MR. MANDEL:  United States calls Fritz Arlo
 6    Looking Cloud, Your Honor.
 7       FRITZ ARLO LOOKING CLOUD, GOVERNMENT'S WITNESS, SWORN
 8                      DIRECT EXAMINATION
 9    BY MR. MANDEL:
10    Q.   Sir, would you state your name, please?
11    A.   My name is Arlo Looking Cloud.
12    Q.   Is your name actually Fritz Arlo Looking Cloud?
13    A.   Yes, sir.
14    Q.   You don't normally go by Fritz, do you?
15    A.   No, sir.
16    Q.   Sir, where are you currently residing?
17    A.   Meade County Jail.
18    Q.   Serving a sentence based on your conviction in this
19    same matter?
20    A.   Yes, sir.
21    Q.   You have been transferred up to Meade County Jail so
22    you could testify here today, is that correct?
23    A.   Yes, sir, I am.
24    Q.   How long have you been incarcerated, sir?
25    A.   Close to eight years.
```

1    Q.   How old are you today?

2    A.   57.

3    Q.   Do you prefer to have me call you Mr. Looking Cloud or

4    Arlo?

5    A.   Arlo would be fine, sir.

6    Q.   We know each other, right?

7    A.   Yes.

8    Q.   Arlo, let me start out, where were you born?

9    A.   I was born in Denver, Colorado.

10   Q.   And have you lived there part of your life?

11   A.   Yes, sir, I have.

12   Q.   Have you also lived on Pine Ridge Reservation part of

13   your life?

14   A.   Yes, sir.

15   Q.   Are you an enrolled Lakota Sioux from the Pine Ridge

16   Reservation?

17   A.   Lakotas.

18   Q.   Could you kind of tell us how long you lived in Denver

19   after you were born?  In other words, how long did you stay

20   there before you came up to Pine Ridge?

21   A.   Six months.

22   Q.   So you were still an infant you came back up to Pine

23   Ridge?

24   A.   Yes, sir.

25   Q.   How long did you stay up on the ridge?

1    A.    1968.

2    Q.    Did you go to school up there?

3    A.    Yes, sir, I did.

4    Q.    Do you remember where you went to school?

5    A.    Went to Holy Rosery at Kyle.

6    Q.    Then you said in '68 you moved?

7    A.    Yes, sir, I did.

8    Q.    Where did you go to at that time?

9    A.    I went down to New Mexico; Santa Fe.

10   Q.    How long were you there?

11   A.    Four years.

12   Q.    So we are up to '72 now.  Where did you go then?

13   A.    I came back to Colorado.

14   Q.    How long were you in Colorado at that point?

15   A.    Until now.

16   Q.    You permanently moved there at that point?

17   A.    Right.

18   Q.    You still came back to the reservation up here on

19   occasion when you were moved there, right?

20   A.    Yes, sir, I do.

21   Q.    But your residence was down there in Denver?

22   A.    Yes.

23   Q.    When you were down there, did you know an individual

24   by the name of Troy Lynn Yellow Wood?

25   A.    Yes.

```
 1    Q.    How did you come in to contact with her?

 2    A.    In '72.

 3    Q.    Do you remember where you met her or how?

 4    A.    On the street.

 5    Q.    Just happened to run in to her?

 6    A.    Yes.

 7    Q.    Did you become a friend of hers?

 8    A.    Yes.

 9    Q.    Did she have a house where a lot of people would get

10    together on kind of a regular basis?

11    A.    Yes.

12    Q.    Do you know where that was?

13    A.    Yes, I do.

14    Q.    Where was it, sir?

15    A.    It was in north Denver on Pecos.

16    Q.    Would you come over there frequently?

17    A.    Yes.

18    Q.    Did a lot of people come over there as well?

19    A.    Yes.

20    Q.    At that time were you familiar with the organization

21    known as the American Indian Movement?

22    A.    Yes.

23    Q.    That's commonly referred to as AIM, right?

24    A.    Yes, sir.

25    Q.    Do you know, was Troy Lynn involved with AIM?
```

```
 1   A.   Yes.

 2   Q.   Were a lot of the people who came to her house

 3   involved as well?

 4   A.   Yes.

 5   Q.   Sir, do you remember a time that you came there in the

 6   latter part of 1975 when an individual by the name of Anna

 7   Mae Aquash was there?

 8   A.   Yes.

 9   Q.   Can you start by telling us -- well, on that date when

10   did you come to her house?  What time of day?

11   A.   In the evening.

12   Q.   Okay.  Arlo, you don't want to get too close to the

13   microphone; that's making it hard for the court reporter to

14   hear.  It was already dark out?

15   A.   Yes.

16   Q.   Okay.  Why did you come to her house that particular

17   night?

18   A.   I was looking for a friend of mind.

19   Q.   Who were you looking for?

20   A.   Joe Morgan.

21   Q.   Was he kind of a buddy of yours?

22   A.   Yes.

23   Q.   Did you guys go out and party together some?

24   A.   Yes.  Yes, sir, we did.

25   Q.   Was that kind of what you had in mind that evening?
```

1    A.   Yes, sir, I did.

2    Q.   Now, as to the date do you remember when that was?

3    A.   It would have to be around somewhere around 27th of

4    November; 27th, 28th, November.

5    Q.   What happened when you arrived at the house?  Did you

6    go in?

7    A.   No, sir, I didn't.  I knocked on the door.  Troy Lynn

8    came to the door, came outside.

9    Q.   Is that the back door or front door?

10   A.   Back door.

11   Q.   Is that kind of where people normally came in?

12   A.   Yes.

13   Q.   Did Troy Lynn talk to you when she came outside?

14   A.   She told me to wait.

15   Q.   To wait for Joe Morgan?

16   A.   No, Joe Morgan was not there.  She told me to wait.

17   Q.   She didn't tell you why?

18   A.   No, she never said.

19   Q.   So you are waiting outside her place?

20   A.   Yes, sir.

21   Q.   Was it cold that night, do you remember?

22   A.   I don't recall, sir.

23   Q.   What happened next?

24   A.   Theda came out.  She went back in and Theda came out.

25   Q.   Is Theda somebody else that you knew?

1    A.    Yes, I do.

2    Q.    How long had you known her?

3    A.    Maybe two years.

4    Q.    Did you also meet her down in Denver then?

5    A.    Yes, sir.

6    Q.    What happened when Theda came out?

7    A.    She asked me if I was doing anything.

8    Q.    Excuse me.  She asked you if you were what?

9    A.    If I was doing anything.

10   Q.    If you were busy.  What did you tell her?

11   A.    I was not doing anything; looking for Joe Morgan.

12   Q.    Did Theda propose anything to you?

13   A.    Yes.  She asked me if I could drive to Rapid City and

14   repeat back in a day.

15   Q.    Was it unusual to you that she was asking you to do

16   this?

17   A.    No.

18   Q.    Why not?

19   A.    I've driven for her many a time.

20   Q.    Were you in school or anything at that time?

21   A.    No.

22   Q.    So you agreed to do it?

23   A.    Yes.

24   Q.    Do you remember what happened then?

25   A.    We go inside her kitchen and we go down to the

1    basement.

2    Q.   When you walk into her house, was there a staircase

3    going up and a staircase going down where you come in?

4    A.   Yes, yes.

5    Q.   The staircase going up went to the kitchen?

6    A.   Yes.

7    Q.   One going down went to the basement?

8    A.   Yes.

9    Q.   Was there kind of little landing there between them?

10            MR. HANNA:  Object to leading.

11            THE COURT:  Sustained.

12   Q.   (BY MR. MANDEL)   So what happened after you got in,

13   sir?

14   A.   Well, we go down to the basement and she tells me to

15   wait.  So I waited.

16   Q.   Was anyone else down in the basement?

17   A.   Yes.

18   Q.   Who was down there?

19   A.   It was John Boy; and there was a lady sleeping on the

20   couch, or a bed.

21   Q.   John Boy was John Boy Patton?

22   A.   Yes.

23   Q.   Did you also know him as John Boy Graham?

24   A.   Yes.

25   Q.   Do you know who the lady was sleeping on the couch?

1  A.   At the time I did not know either person.  I did not

2  know -- I have never met them; I have never heard of them.

3  Q.   So you walked in.  They were both strangers to you?

4  A.   Yes, sir.

5  Q.   Did you later find out who she was?

6  A.   Yes, sir, I did.

7  Q.   Who did you find out she was?  Who was she?

8  A.   Anna Mae, Anna Mae Aquash.

9  Q.   Sir, after you got down in the basement with her and

10 John Boy, did anyone else come down?

11 A.   Just Theda.  Theda and Troy Lynn came down.

12 Q.   What happened next?

13 A.   Well, we waited a while and Troy brought some coffee

14 down.  And I think that was it.

15 Q.   You just sat down there drinking coffee?

16 A.   Yeah.  Maybe about 10 or 15 minutes.

17 Q.   Was Anna Mae awake?

18 A.   No.  No, sir.

19 Q.   She was sleeping?

20 A.   Right.

21 Q.   So you were drinking coffee.  Was John Boy?

22 A.   I guess he was standing around.

23 Q.   What happened then?

24 A.   Well, I wait for Theda.  And Theda comes down and she

25 says, "We are ready to go," you know.  "We are ready to

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1   go."

2   Q.   You understood that to mean going where?

3   A.   Rapid City here, I guess.

4   Q.   What took place then?

5   A.   Well, we leave; get in the car and we come here.

6   Q.   Did somebody wake Anna Mae up?

7   A.   Yes.

8   Q.   Who did that?

9   A.   John Boy.

10  Q.   Was anything done with Anna Mae at that point?

11  A.   No.  We all leave.

12  Q.   Was she tied up at that point?

13  A.   Yes.

14  Q.   Who did that?

15  A.   John Boy.  Well, Theda wanted to ask Troy Lynn to get

16  a rope; and I don't know who got the rope, but she was

17  eventually tied; her hands were tied.

18  Q.   Do you remember if they were tied in front or in back?

19  A.   I don't recall.  But I think it was in the front.

20  Q.   Now, Theda's car was just parked out in back there

21  somewhere?

22  A.   Yes, in the parking lot.

23  Q.   Do you remember was her car a hatch back or station

24  wagon?

25  A.   Station wagon.

1    Q.    It was square in the back?

2    A.    Yes, sir.

3    Q.    Do you remember how the window opened up?

4    A.    No.  I think the back kind of swung up like a hatch

5    back.

6    Q.    Like the door and the window?

7    A.    Right.

8    Q.    Was Anna Mae placed in that vehicle?

9    A.    Yes.

10   Q.    Who did that?

11   A.    John Boy did.

12   Q.    Did the three of you then get in the vehicle?

13   A.    Yes.

14   Q.    Who was driving?

15   A.    I was.

16   Q.    Where was Theda?

17   A.    On the passenger side.

18   Q.    Was John Boy in the back seat then?

19   A.    Yes, sir.

20   Q.    Do you remember where you went to from there?

21   A.    We came here Rapid City.

22   Q.    Do you remember about what time you left Denver?

23   A.    It was in the evening.  I can't remember what time it

24   was.

25   Q.    Did you drive all night to get here from Denver?

```
 1    A.   Yes, sir.

 2    Q.   Did you stop for gas or food or anything on the way

 3    that you recall?

 4    A.   No, sir; no, I don't recall.

 5    Q.   Do you recall any conversations on the way?  I will

 6    start with this:  did Anna Mae say anything?

 7    A.   No.

 8    Q.   What about Theda?

 9    A.   She might have been; somewhere along the line I think

10    we switched drivers and Theda got in front on the driver's

11    side, and John Boy got on passenger, and I got in the back.

12    Q.   When you made it to Rapid City, do you know what time

13    of day it was?

14    A.   No, I do not recall.

15    Q.   Was it light out yet?

16    A.   No, sir.

17    Q.   So it was dark the whole time you drove here?

18    A.   Yes.

19    Q.   When you got to Rapid City, sir, where did you go?

20    A.   We went to a vacant apartment.

21         MR. MANDEL:  May I approach, Your Honor?

22         THE COURT:  You may.

23    Q.   (BY MR. MANDEL)   Sir, I have placed Exhibit 13 in

24    front of you.  I will ask you:  do you recognize that as

25    being the apartment you went to?
```

1  A.   I do not recall, but it do look somewhat like it,

2  yeah.

3  Q.   Let me ask you this, then.

4  A.   It's been a while.

5  Q.   At some point were you up by those apartments with Bob

6  Ecoffey?

7  A.   I do not recall anything with Bob Ecoffey.

8  Q.   You don't recall anyone taking picture up there?

9  A.   No.

10  Q.   All right.  Do you know whose apartment it was?

11  A.   No, sir.

12  Q.   How did you guys get into it?

13  A.   Theda had a key.

14  Q.   When you went into the apartment, what was it like?

15  Was it furnished, people living there?  What was it?

16  A.   It was empty.  It was no furniture or nothing.

17  Q.   After you got there, what took place?  Let me start

18  with this:  Where did Anna Mae go?  Where was she put?

19  A.   She was placed in a room; might have been on top

20  stairs; let's see.

21  Q.   It kind of has a main floor, an upstairs and a

22  basement?

23  A.   I do not recall no basement, but there was two floors,

24  yes.

25  Q.   So she was placed in a room.  Did anybody stay with

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1   her in the room?

2   A.   Yes, John Boy did.

3   Q.   Did you and Theda do anything at that point?

4   A.   Well, we went across the street to another apartment

5   and we got some food and came back to the apartment.

6   Q.   It was an apartment like the same complex?

7   A.   Yes, across the street; straight across.

8   Q.   Okay.  What happened then after you came back with the

9   food?

10   A.   I go to a room and Theda.

11   Q.   Well, I probably asked this wrong.  Did you guys eat

12   when they came back with the food?  Did you have a meal?

13   A.   I don't recall, but we must have.

14   Q.   So you don't remember eating; you don't remember the

15   meal?

16   A.   No.

17   Q.   When you were there, did Theda give you something?

18   A.   Yes.  She asked me if I was hung over or hanging over.

19   I replied, "Yes."  She gave me two pills.

20   Q.   Do you know what they were?

21   A.   No, but I was assuming they were aspirin, or Tylenol,

22   or whatever.

23   Q.   Did you know Theda was a nurse?

24   A.   Yes.

25   Q.   So you felt comfortable taking something from her?

1    A.   Yes, sir.

2    Q.   After you took those pills, sir, did you go to sleep?

3    A.   Yes, I did.

4    Q.   Do you know how long you slept?

5    A.   Not very long.  Took me a while to get to sleep, so

6    before I went to sleep, I have to use the restroom.

7    Q.   Do you remember about when it was when you woke up

8    again?

9    A.   Probably getting towards the morning; dawn.

10   Q.   Towards the next morning?

11   A.   The same morning.  I don't recall, really I can't, but

12   I would assume it would be the same morning.

13   Q.   Okay.  So maybe towards noon or something is what you

14   are saying?

15        MR. HANNA:  Object to leading.

16        THE COURT:  Sustained.

17   Q.   (BY MR. MANDEL)  I am trying to find out about what

18   time you think it was, sir.  Do you know?

19   A.   I don't recall; I don't recall at all.

20   Q.   Was Theda's car still there at the apartment?

21   A.   Well, you know, I went to use the bathroom sometime; I

22   don't recall when; but I have to use the restroom.  And on

23   my way to the restroom, I heard --

24        MR. HANNA:  Judge, I object.

25   Q.   We are not going to get into that right now, Arlo

1   okay?  Did Theda come back to the house at some point?

2   A.   Yes.

3   Q.   Let me ask you this, sir:  did you leave the house

4   during the day?

5   A.   Yes, I did.  In the afternoon sometime, sometime in

6   the afternoon when she asked me to go get some gas that

7   we'd be leaving.

8   Q.   Theda was there at the house with you at that time?

9   A.   Yes.

10   Q.   Do you know, was Anna Mae there at that time?

11   A.   I don't recall, but she gave me the money to go get

12   some gas.

13   Q.   Theda did?

14   A.   Right; and the keys.

15   Q.   Again, do you know what time of day that was, sir?

16   A.   It would be in the evening; evening.

17   Q.   It was it already dark yet?

18   A.   I don't recall, but might have been dusk.

19   Q.   When you got the money, what did you do, sir?

20   A.   I went and I got some gas.  And I had a friend that

21   lived down the street there, maybe 10 blocks, and I go

22   visit him.

23   Q.   What was his name?

24   A.   Tony Red Cloud.

25   Q.   He had a house down that same street?

1   A.   Yes, an apartment.

2   Q.   What did you do over at Tony's?

3   A.   We had a visit and I ate.  I had dinner with him.

4   Q.   Do you know how long you were there?

5   A.   Maybe half-hour.

6   Q.   What did you do next?

7   A.   I go back to the apartment.

8   Q.   When you got in the apartment -- first of all, was it

9   dark at that point?

10   A.   Yes, sir.

11   Q.   Who was present at that time?

12   A.   I'm sorry?

13   Q.   Who was present?  Who was there?

14   A.   I don't recall, but I think the same; the four of us.

15   Q.   Was Theda there when you showed up?

16   A.   Yes.

17   Q.   Did she have any words with you?

18   A.   Yes.

19   Q.   What did that refer to?

20   A.   She wanted -- she was upset and she wanted to know

21   where I went, and who I talked to, what I had done, you

22   know; why I took so long.

23   Q.   She was mad?

24   A.   Yes.

25   Q.   Did you understand why?

1    A.    Because I took so long.

2    Q.    What happened then?

3    A.    We leave.

4    Q.    The four of you?

5    A.    Yes.

6    Q.    Where was Anna Mae riding in the car this time?

7    A.    She was in the back.

8    Q.    Do you recall, was she tied up at that time?

9    A.    At that time I do not recall, no, sir.

10   Q.    Who drove from there in Rapid City?

11   A.    I did; I drove.

12   Q.    Who else was in front?

13   A.    Theda.

14   Q.    Was John Boy in back?

15   A.    Yes.

16   Q.    When you left there, do you remember what roads you

17   took?

18   A.    We took road that goes through Scenic; and we go to

19   Sharps.  And Theda drives after that; we switch drivers.

20   Again in the back seat, and Theda drives, and John Boy gets

21   in the passenger side.

22   Q.    So you were then in the back seat?

23   A.    Yes.

24          MR. MANDEL:  May I approach, Your Honor?

25          THE COURT:  You may.

1    Q.   (BY MR. MANDEL)   I am showing you Exhibit No. 22.   Do

2    you recognize that as a map of this area?

3    A.   Yes.

4    Q.   Are you able to see the roads you drove on on that

5    map?

6    A.   Yes.  I see Sharps Corner right here.

7    Q.   Okay.

8         MR. MANDEL:  Your Honor, I'd offer Exhibit 22 at

9    this time.

10        MR. HANNA:  No objection.

11        THE COURT:  Exhibit 22 is received.

12        MR. MANDEL:  If I may publish it, Your Honor?

13        THE COURT:  You may.

14   Q.   (BY MR. MANDEL)   Arlo, if you can take a look on your

15   screen on your right there.  First of all, sir, you said

16   you took Highway 44 down to Scenic?

17   A.   Right, 27.

18   Q.   Use your finger on it to show the route you went.  You

19   came down 44, then to Scenic, then down to Sharps Corner?

20   A.   Yes, sir.

21   Q.   Where did you go from Sharps Corner?

22   A.   From there, Sharps Corner, Theda drove from there.

23   Q.   Where did you drive to?

24   A.   Evidently she drove to Rosebud because that's where I

25   woke up.

1    Q.    You weren't paying attention what roads at that point?

2    A.    No, sir, I wasn't.

3    Q.    Did you go to sleep in back?

4    A.    Yes, sir, I did.

5    Q.    Look at the map up there again.  Arlo, in the lower

6    right-hand corner of this little box that says, "Bill

7    Means," do you see that little blue box?

8    A.    Yes, I do see it.

9    Q.    Do you know where you went to on Rosebud?

10   A.    I did not know at the time, but it would have --

11         MR. HANNA:  Objection; asked and answered.

12         THE COURT:  Well, ask your next question.  The

13   answer so far stands.

14   Q.    (BY MR. MANDEL)   At the time you didn't know where on

15   the Rosebud it was?

16   A.    Yes.

17   Q.    Did you know that it was on the Rosebud Reservation?

18   A.    No, I did not.

19   Q.    Did you even know that it was on the reservation?

20   A.    No.

21   Q.    Was there anything you noted in the area where you

22   stopped, anything unusual, structures, or anything like

23   that?

24   A.    There were lights; there was some lights like a

25   building and like a hospital.

```
 1    Q.   A hospital?
 2    A.   Yes.  Looked like -- I don't recall, but somehow I
 3    assumed it was a hospital.
 4    Q.   Did you later find out where it was that you had gone
 5    to?
 6    A.   Yes.
 7    Q.   I am not asking you where, but I am asking you:  how
 8    did you find out?
 9    A.   I don't recall.
10    Q.   Was it something you learned in your own case?
11    A.   Yes.
12    Q.   Where did you stop out there?
13    A.   We stopped at a house.
14    Q.   What happened when you got to the house?
15    A.   When we got to the house, Theda went in inside the
16    house and she came out maybe 10 minutes -- 5 or 10 minutes
17    and she grabbed John Boy and they both went inside the
18    house.  And she asked me to stand in the back of the Pinto.
19    Q.   Did she say why she wanted to you stand in the back?
20    A.   No, she didn't tell me why.  But she just said, "Stand
21    right here."
22    Q.   Did you have an understanding of why you were told to
23    stand back there?
24    A.   Now I do.
25    Q.   You say now you do?
```

1    A.    Yes.

2    Q.    Did you at the time?

3    A.    No.

4    Q.    What do you now think was the reason you were asked to

5    stand there?

6    A.    To guard.

7    Q.    To guard?

8    A.    To stand there right.

9    Q.    Keep her from leaving?

10   A.    I guess, yes.  I presume.

11   Q.    Do you recall any conversations that you and Anna Mae

12   would have had?

13   A.    No, I never had no conversations with Anna Mae.

14   Q.    How long were you standing out there?

15   A.    Maybe 10 -- 5 or 10 minutes.

16   Q.    Then what happened?

17   A.    And they both come out.  And I asked to use the

18   restroom.

19   Q.    Restroom in the house?

20   A.    Yes, sir.

21   Q.    What took place then?

22   A.    And Theda took me to the house and she knocked on the

23   door.

24   Q.    Do you recall who answered the door?

25   A.    It was Charlie Abourezk.

```
 1    Q.   You said Charlie Abourezk?

 2    A.   Yes, sir.

 3    Q.   How did you know him?

 4    A.   I knew him before.  And Theda asked me if I knew him.

 5    Q.   Is there anything unusual about his appearance that

 6    helped you identify him?

 7    A.   He was like -- he was almost Caucasian.

 8    Q.   Do you recall if he was short or tall?

 9    A.   He was tall.

10    Q.   Where did you seen him before?

11    A.   I seen him around, yes, I have.  Whenever they have

12    AIM rallies, whatever, for that sort.

13    Q.   Up on Pine Ridge, or down in Denver, or where?

14    A.   In Pine Ridge, Rapid City.

15    Q.   What happened after he came to the door?

16    A.   Well, he takes me to the bathroom and I use the

17    bathroom.

18    Q.   Then what?

19    A.   And then I leave.  I walk out.

20    Q.   Did you talk to him at all while you were there?

21    A.   No, sir, I didn't.

22    Q.   Did you observe any other people in the house while

23    you were there?

24    A.   There was some people sleeping on the floor.  And all

25    I seen was like real light blond hair facing the other way.
```

1    Q.   A male or female?

2    A.   Female.

3    Q.   Did you know who that was?

4    A.   No, sir, I don't.

5    Q.   Anything else that you saw?

6    A.   No.

7    Q.   Were there people still up in the house?

8    A.   No, sir, just Charlie Abourezk.

9    Q.   Is it possible they were up?  I mean, Theda and John

10   Boy had just come up, right?

11   A.   Yes.

12   Q.   Was it possible people were up in another part of the

13   house?

14   A.   It's possible, yes.

15   Q.   But you didn't see them?

16   A.   No.

17   Q.   So what happened then?  You left the house, you said?

18   A.   Yes, we left the house.  And Theda is driving.  I

19   might have drove for a little while, but I can't remember.

20   Q.   Did you even know what road you were on at that point?

21        MR. MANDEL:  I will ask the clerk to put the map

22   up again.

23   A.   18.

24   Q.   You guys got on to Highway 18 and started traveling

25   west?

```
 1              MR. HANNA:  Objection; leading.

 2              THE COURT:  Overruled.

 3    Q.   What direction were you traveling, Arlo?

 4    A.   West.

 5    Q.   Where were you going to?

 6    A.   I did not know at the time, but we ended up in Allen.

 7    Q.   Do you remember what route you took to get to Allen?

 8    A.   18.

 9    Q.   All the way until the cutoff?

10    A.   Yes, sir.

11    Q.   Then were you still driving the whole time?

12    A.   Theda was.  We switched drivers.

13    Q.   Let me ask you:  on this ride, did you make any stops?

14    A.   No, we didn't.

15    Q.   You went straight through from Rosebud to Allen?

16    A.   Yes.

17              MR. HANNA:  Objection, Judge.  He hasn't

18    testified Rosebud.

19              THE COURT:  Sustained.

20              MR. HANNA:  Move to strike.

21              THE COURT:  Granted.  Ask your next question.

22    Q.   (BY MR. MANDEL)   Can you see on the map where Allen

23    is located?  Did you take the road that comes off of 18 to

24    go up to Allen?

25    A.   Yes, we did.  Off 18 going north.
```

1    Q.   Arlo, I don't know how you got those arrows on there.

2    They just came up that way, correct?

3    A.   Correct.

4    Q.   What happened when you got to Allen?

5    A.   We go to Mr. Marshall's residence.

6    Q.   Did you know Dick Marshall?

7    A.   Yes, sir.

8    Q.   I will ask you:  do you see him seated in the

9    courtroom today?

10   A.   Yes.

11   Q.   Can you describe where he is seated and what he's

12   wearing, sir?

13   A.   He's sitting beside the bald man right there.

14   Q.   What is he wearing?

15   A.   Blue checkered shirt; blue and white.

16            MR. MANDEL:  Your Honor, I ask the record

17   indicate the witness has identified the defendant.

18            THE COURT:  It may.

19   Q.   (BY MR. MANDEL)   Did all of you come to the door of

20   the house there?

21   A.   Yes.

22   Q.   Do you recall who answered the door?

23   A.   No, I don't recall.

24   Q.   Do you recall what time of day it was?

25   A.   It was at night.

```
1    Q.   Do you know about what time of night?

2    A.   No.  Maybe 11:00, midnight.

3    Q.   So late in the evening?

4    A.   Yes.

5    Q.   Did the four of you go into the house?

6    A.   Yes.

7    Q.   Do you recall what took place then, sir?

8    A.   Theda goes into a bedroom and the three of us, we stay

9    out in the living room.

10   Q.   Was anyone else present at the house?

11   A.   There was a lady with us standing out in the living

12   room.

13   Q.   Did you know her?

14   A.   I don't know her personally, or I have never really

15   had no conversations with her before, but I believe I seen

16   her around; I am not sure.

17   Q.   How long was Theda in the bedroom with Dick?

18   A.   Maybe about 5, 5 minutes; 5 or 10 minutes.

19   Q.   Then what happened next?

20   A.   And she calls us in, John Boy and I.  She calls us

21   into the bedroom where they were at.

22   Q.   Now, when you guys went into the bedroom, were Anna

23   Mae and this lady there at the house?

24   A.   In the living room; they were in the living room.

25   Q.   Do you recall them eating or drinking anything?
```

1    A.    No.  I do not recall.

2    Q.    What happened when you went into the bedroom?

3    A.    I see Mr. Marshall on the bed sitting on the bed and

4    Theda beside her -- I mean, beside him; and John Boy and I

5    sat on the side against the wall.

6    Q.    Was there any discussion that took place?

7    A.    No, no discussion.

8              MR. HANNA:  Objection; asked and answered.

9              THE COURT:  You can ask your next question.

10   Q.    There was no discussion that took place, what happened

11   next?

12   A.    He hands a note or a piece of paper -- I assume it's a

13   note -- and I don't recall if he passed it back to Theda

14   and Theda handed it to John Boy or handed the note or the

15   piece of paper to John Boy; I don't recall which, but John

16   Boy ends up with it, then he passes it on to me.  Then I

17   give it back to Theda.

18   Q.    Do you ever look at what the note said?

19   A.    No, sir, I did not.  I don't know what it said.  I

20   don't know.

21   Q.    Was there any discussion that took place at that

22   point?

23   A.    No.

24   Q.    What then happened?

25   A.    And then Dick Marshall -- there's a night stand beside

1    the bed and he reached in one of the drawers, opens it, and

2    he brings out a box; he opens the box and there's a pistol

3    in there.

4    Q.   How big was the box?

5    A.   It wasn't very big.

6    Q.   Just big enough to hold the pistol?

7    A.   Yes.

8    Q.   Do you recall what the pistol looked like?

9    A.   It was silver with a brown handle.

10   Q.   Do you know the difference between a revolver and an

11   automatic?

12   A.   Yes, sir, I do.

13   Q.   Do you recall which it was?

14   A.   It was a revolver.

15   Q.   Do you remember the color of the box?

16   A.   I believe it was red.

17   Q.   What happened then?

18   A.   And he hands the pistol to Theda.

19   Q.   In the box or just by itself?

20   A.   By itself.

21   Q.   Is there anything else that happened?

22   A.   He reaches inside and he gets the box and a box of

23   shells.

24   Q.   About how big a box was that?

25   A.   Not very big.  It wasn't very big.

1    Q.    Can you show it with your hands about how long?

2    A.    Maybe about that long; maybe about that big.

3    Q.    That was also given to Theda?

4    A.    Yes.

5    Q.    Do you know what she did with those two things, where

6    she put them?

7    A.    No, but I assume it's in her pocket in her coat

8    pocket.

9    Q.    What happened next?

10   A.    We leave; same four.

11   Q.    Anna Mae is put in the back again?

12   A.    Yes.

13   Q.    Where is Theda?

14   A.    Theda is on the passenger side and I am driving.

15   Q.    I take it John Boy is in the back seat?

16   A.    Yes, sir.

17   Q.    Where do you head to at that point?

18   A.    We go towards Wanblee.

19   Q.    Did you go make any stops?

20   A.    Yes.  Along the way we were running out of gas and I

21   stopped at my grandmother's house.

22         MR. MANDEL:  I'll ask the clerk to put up the map

23   again, please.

24   A.    From Allen we take this route.  Before we get to Kyle

25   there's another road that connects with two; and we get on

JUDITH M. THOMPSON
(605) 348-8610      FAX  (605) 343-6842

1    two and go down to the housing, Potato Creek Housing.   And

2    that's where (pause).

3    Q.    That's where your grandmother lives?

4    A.    Yes.

5    Q.    Is that another kind of cluster home housing area?

6    A.    Yes, sir, it is.

7    Q.    And how did she have gas there at her house?

8    A.    Her car; she has a car, my aunt.

9    Q.    Did you guys siphon some off with her permission, or

10    what?

11    A.    Yes, I did.

12    Q.    Back then -- I know this was a long time ago -- was

13    there anyplace to get gas at night in that part of the

14    woods?

15    A.    No, sir.

16    Q.    So if you needed gas, did you have to get it from

17    someone like that?

18    A.    Yes.

19    Q.    From Potato Creek, where did you go to next?

20    A.    We proceed on to Wanblee.

21    Q.    That's just east of Potato Creek?

22    A.    Yes.

23    Q.    About how far away timewise?

24    A.    Not very far.

25    Q.    Did you make any other stops on the way to Wanblee?

1    A.   Well, on the way to Wanblee we passed the junction,

2    that Interior junction, and as we passed the junction we

3    see a red light in back of us; a flashing red light.

4    Q.   Arlo, is that Interior junction where the road east

5    out of Potato Creek hits Highway 44?

6    A.   Yes, it is.

7    Q.   All right.  Then tell us what happened there?

8    A.   Well, the police car, it was a flashing red light and

9    there was a police car behind us mile or two, maybe.  We

10   could see the red light, flashing red light.

11   Q.   So were you speeding?

12   A.   No, sir, but Theda tells me slow down anyway, you

13   know.

14   Q.   Did she tell you anything else?

15   A.   No, but she hands me the gun.  She said, "Here," so I

16   get the gun and I put it underneath the seat.

17   Q.   What did you think about that?

18   A.   I was mostly concentrating on the red light, the car.

19   I don't know, I really can't recall, but the red light was

20   on my mind, if I was speeding.

21   Q.   So you put that gun under your seat?

22   A.   Yes.

23   Q.   What happened then?

24   A.   And next thing we know the police car, the cop car,

25   heads west -- north, north, sorry.  North on 44 going

```
 1    towards Interior.

 2    Q.   So it wasn't trying to stop you guys?

 3    A.   No.

 4    Q.   Just kind of a coincidence?

 5    A.   Yes.

 6    Q.   What happened then?

 7    A.   And Theda asked for the gun back.

 8    Q.   That strike you odd at all?

 9    A.   No.

10    Q.   Did you give her the gun back?

11    A.   Yes.

12    Q.   Then what happened next?

13    A.   And next I go down to Wanblee.  And just before I get

14    to Wanblee, there's a house.  And she wants me to pull into

15    the house.  We pull into the house and -- well, I can't

16    remember.  But, anyway, we switch drivers.

17    Q.   Sorry, you said what?

18    A.   After that house, after we pulled into that house, she

19    goes to check the house, but no one was home.  So come back

20    out and she wants to drive.  So we switch drivers again.

21    Q.   Still right outside of Wanblee?

22    A.   Right.

23    Q.   Then what?

24    A.   I get in back, Theda is driving, and John Boy is on

25    the passenger side.
```

1    Q.    Where did you go?

2    A.    We go to another house inside Wanblee.  And again, no

3    one was home.  So we leave.

4    Q.    Nobody answered the door at either place?

5    A.    No.

6    Q.    Wanblee is a small town, right?

7    A.    Yes.

8    Q.    Was there anybody up and out and about that you

9    remember at that time in Wanblee?

10   A.    No.

11   Q.    What happened then?

12   A.    Then we leave.  We leave and we are going north.

13   Q.    Do you remember how -- the road out of Wanblee I guess

14   goes east in one direction, then south and west in the

15   other direction, does that look right to you?

16   A.    Right.  We go east up to the junction and we go

17   towards Kadoka.

18   Q.    Junction at Highway 73?

19   A.    Yes, 73.

20   Q.    Then you took a left turn north to Kadoka, you said?

21   A.    Yes, sir.

22   Q.    Then what happened?

23   A.    I go to sleep, and I wake up when she turns around.

24   She stops, she turns around.  Actually, she makes another

25   turn, then she goes north again, and she goes south again,

1    she turns around again, then she stops.

2    Q.   So she stopped, she went south, she went north again,

3    went south again, then finally stopped going north?

4    A.   Yes.

5    Q.   You know about where that was?

6    A.   No.

7    Q.   You know was that still on the reservation though?

8    A.   Yes.

9    Q.   Was it in an area where there are some Badlands

10   formations?

11   A.   Yes.

12   Q.   Which side of the road did she stop on, left or right?

13   A.   On the west side.

14   Q.   West side?

15   A.   Yes, and we are facing south.

16   Q.   Was she right next to the road where she stopped, or

17   did she pull off a ways, or do you remember?

18   A.   I don't recall.

19   Q.   What happened then?

20   A.   John Boy gets off, goes in the back, gets her out, and

21   they start to walk towards the ditch.

22   Q.   Towards what?

23   A.   Towards off the road.

24   Q.   In what direction?

25   A.   West.

```
 1    Q.    Then what?

 2    A.    And then Theda tells me go with him.

 3    Q.    Did she say why?

 4    A.    No.

 5    Q.    Did you go with them?

 6    A.    Yes.

 7    Q.    How far did the three of you go?

 8    A.    They were already ahead of me, both of them.

 9    Q.    How far ahead?

10    A.    I don't recall, but it would have to be maybe from

11    here to the middle of the wall there.

12    Q.    Did you kind of try and catch up with them?

13          MR. HANNA:  Excuse me, Judge.  Could the record

14    reflect a certain amount of feet when he's saying toward

15    the wall there.  30 feet, perhaps?

16    A.    Perhaps; maybe middle of the wall.

17          THE COURT:  Why don't you ask the distance.

18    Q.    Do you know what the distance would have been in feet?

19    A.    I can't tell feet, but maybe about halfway to that

20    wall, the distance.  But, yeah.

21          MR. HANNA:  Distance of about 30 feet?

22    A.    30 feet, maybe.

23          THE COURT:  You have the opportunity to

24    cross-examine.  Ask your next question.

25    Q.    (BY MR. MANDEL)   What took place next, sir?
```

```
 1    A.    And then he shoots her.

 2    Q.    John Boy shot Anna Mae?

 3    A.    Yes.

 4    Q.    How did he shoot her?

 5    A.    With a pistol.

 6    Q.    Did he shoot her any particular place?

 7    A.    In the head.

 8    Q.    Front or back?

 9    A.    In the back.

10    Q.    Do you remember where?

11    A.    No.

12    Q.    Do you remember what happened after she was shot?

13    A.    She went over; I don't see her no more.  She's not

14    laying on the ground.

15    Q.    Was there kind of a ledge there?

16    A.    Yes.

17    Q.    Did she go off that ledge?

18    A.    She must have.  I don't know there was a ledge there

19    until I get over there.

20    Q.    Do you know if she was pushed or got there from being

21    shot?

22    A.    Probably from being shot.

23    Q.    What happened then, sir?

24    A.    Then I asked for the gun and I fired the rest of the

25    rounds.
```

1    Q.   Why did you do that?

2    A.   I was afraid might shoot me next.

3    Q.   Where did you fire the rounds?

4    A.   I don't really recall.  Just west.

5    Q.   Was the pistol you shot the same pistol that you got

6    at Dick Marshall's?

7    A.   Yes.

8    Q.   Do you remember how many shots you took with it?

9    A.   No.

10   Q.   Did you shoot it until it clicked?

11   A.   Yes.

12   Q.   What happened then?

13   A.   And then we leave.

14   Q.   Go back to the car?

15   A.   Yes.

16   Q.   Who drove?

17   A.   Theda was driving.

18   Q.   Where were you?

19   A.   In the back seat.

20   Q.   John Boy was in front?

21   A.   Yes.

22   Q.   What was said?

23   A.   Nothing was said.

24   Q.   You guys go out -- take someone out in the Badlands

25   there, gets shot in the back of the head, and you don't say

1    a word?

2    A.   Nothing was said to me.

3    Q.   Was anything said at any point?

4    A.   They had discussions themselves.  I was never included

5    whatever they said.

6    Q.   What happened then?

7    A.   We get to a bridge and they want to put the gun in the

8    bridge -- under the bridge.

9    Q.   Where was that bridge relative to where you stopped?

10   A.   It was a ways back on close to below Potato Creek

11   Housing.

12   Q.   Which housing?

13   A.   Potato Creek.

14   Q.   You headed back past through Wanblee?

15   A.   Right.

16   Q.   Was this bridge between Wanblee and Potato Creek

17   somewhere?

18   A.   Yes.

19   Q.   Was it light out at that point?

20   A.   Yes.

21   Q.   What was done with the gun?

22   A.   It was put in a pillow case and we buried it

23   underneath the bridge.

24   Q.   Right next to the post, or away from it, or where?

25   A.   Under the bridge.

1    Q.   Was it in a spot that you'd be able to find later?

2    A.   Yes.

3    Q.   Then what?

4    A.   I have no idea.  Against the wall on the bridge;

5    anyone could have found it.

6    Q.   Did you get back in the car at that point?

7    A.   Yes.

8    Q.   Was anything said?

9    A.   No, nothing was said until we got gas; we ran out of

10   gas on 18.

11   Q.   How did you -- okay.  You were between Wanblee and

12   Potato Creek.  Where did you go from there?  Did you go to

13   Kyle, or --?

14   A.   Yes.  We went back the same way through Allen, and on

15   over to 18, and on 18 we are going west towards Batesland

16   and we run out of gas.

17   Q.   Okay.  Batesland is kind of right on that county line

18   on the left there for Shannon County?

19   A.   Right.

20   Q.   Okay.  Was there a gas station in Batesland or what

21   did you do?

22   A.   Yes.  But a gas truck gave us some gas before we get

23   into Batesland.

24   Q.   Like a gas delivery truck?

25   A.   Right.

1   Q.   He just stopped and helped you guys out?

2   A.   Right.

3   Q.   Then did he just give you a gallon or something?

4   A.   Yes.  I don't recall how much he gave us, but gave us

5   some gas.

6   Q.   Did you then go buy some gas, too?

7   A.   Yes.

8   Q.   Where was that?

9   A.   In Batesland.

10   Q.   What happened from there?

11   A.   From there we come back to Denver.

12   Q.   Just drove straight back down?

13   A.   Yes.

14   Q.   Stop for food or anything on the way?

15   A.   I don't recall.

16   Q.   Was there any discussion on the way?

17   A.   After we leave Batesland, Theda says, "If anyone says

18   anything, tell them that I did it."  That she did it.

19   Q.   She said, "If anyone says anything tell them that I

20   did it?"

21   A.   Yes.

22   Q.   What did you understand that to mean?

23   A.   That she shot her.

24   Q.   She was going to take the blame?

25   A.   Yes.

1    Q.   Any other discussion on the way back to Denver?

2    A.   No.

3    Q.   Where did you go when you got down there?

4    A.   Back to Denver.

5    Q.   Who got out first?

6    A.   She dropped John Boy and I at Angie Begay's residence.

7    I did not know John Boy was living with Angie Begay at the

8    time.

9    Q.   Did you know Angie, though?

10   A.   Yes.

11   Q.   Did you go in there or what?

12   A.   Yes.  I stayed the night.

13   Q.   Do you remember what time of day it was when you got

14   there?

15   A.   No, I don't recall.

16   Q.   You guys talk about what had happened at all?

17   A.   No.

18   Q.   What did you think about it?

19   A.   I started tripping.  Kind of blew my mind, you know.

20   Freaked me out.  Blew my mind.  I don't know.

21   Q.   Did you do anything?

22   A.   No.

23   Q.   Were you scared of getting in trouble with law

24   enforcement?

25   A.   I was afraid of everyone.  I could not trust anyone.

```
1    Even to this day, I don't trust no one.

2    Q.   Did you see Theda after that?

3    A.   Not right away, but years some time later I did see

4    her.

5    Q.   Did you ever talk to her about it?

6    A.   No.

7    Q.   Did you see John Boy after that?

8    A.   No.  He was around Denver for a little while after

9    that, but just for a little while.  And at one point Sioux

10   Black asked me to help her drive and drive John Boy south,

11   she said.  That's all she said, "South."  So we leave.

12   Q.   Is that Sioux Woman Black?

13   A.   Yes.

14   Q.   She spells Sioux like Sioux Indian, S-i-o-u-x?

15   A.   Yes, sir.

16   Q.   What happened?

17   A.   So we get in the car.  Sioux is driving, and I am on

18   the passenger side, and John Boy is in the back seat.  And

19   we are going south from Denver and we get to Colorado

20   Springs and --

21   Q.   Did you know where you were going to?

22   A.   All she told me was south; we are going south; we are

23   taking John Boy south.  And we get to Colorado Springs I

24   want to get out.  I change my mind.  I said, "I want to get

25   out.  My son is coming back and I want to get out."  But
```

```
 1    she didn't want to stop.  So finally I opened the door and
 2    so she said, "Okay, okay."  She pulls over to the side and
 3    I get off.  I cross the interstate to the station, the last
 4    gas station, and I don't see them again.
 5    Q.   Is there something you were afraid of at that time?
 6    A.   Yes.
 7    Q.   What?
 8    A.   Figured they were taking me for a ride next.
 9    Q.   You mean take you for a ride that you wouldn't be
10    coming back from?
11    A.   Right.
12    Q.   Did they say anything to you?
13    A.   No.
14    Q.   That was kind of just your feeling from it?
15    A.   Yes.
16    Q.   How was Sioux Black involved in any of this?
17    A.   She's a sister of Troy Lynn.  Good friend, sister;
18    they have always been pretty close.  Angie Begay is a
19    pretty type people; all this group there.
20    Q.   So after this happened, you stayed in Denver, right?
21    A.   Yes.
22    Q.   Did this stay on your mind?
23    A.   Pardon?
24    Q.   Did this whole incident stay on your mind?  Did it
25    keep bothering you?
```

1          MR. HANNA:  Objection to leading.

2          THE COURT:  Overruled.

3   A.   I just could not trust anyone anymore.

4   Q.   Why couldn't you trust anyone?

5   A.   Just couldn't.

6   Q.   Just because of this incident?

7   A.   Yes.

8   Q.   At that time were you doing a lot of drinking, Arlo?

9   A.   Yes.

10  Q.   Were you taking drugs?

11  A.   Yes.

12  Q.   Did you get in trouble with the law?

13  A.   Yes.

14  Q.   Frequently?

15  A.   I don't know; probably, yeah.

16  Q.   Were you married?

17  A.   I was, but not anymore.

18  Q.   When did you get married?

19  A.   Legally married in 1996.

20  Q.   Okay.  At that time weren't you hooked up with

21  someone?

22  A.   Yes.  My fiancee -- my son was two years old.  That's

23  how I remember the birth date; his birthday was on the

24  29th, November 29, and my fiancee and my son were going to

25  their mother-in-law's in Scottsbluff.  And I stayed behind

1    so I can party and drink; drink one more time before I

2    settle down.  And that morning to drink one more time cost

3    me my time and my marriage and my life is a nightmare.

4    Q.   When you were living with this woman down there, did

5    you guys have a house?

6    A.   Yes, we had an apartment that was right below Troy

7    Lynn's.  Right across the field there was a field, an empty

8    lot.

9    Q.   When did the two of you break up?

10   A.   It was sometime after that.

11   Q.   Same year, or --?

12   A.   Might have been a year after; year or two.

13   Q.   Did you still have a place to live down in Denver?

14   A.   I moved down to Florida.  I ended up in Florida.

15   Q.   How long were you down there?

16   A.   Maybe a year or little over a year.

17   Q.   Did the time ever come when somebody came to you and

18   started talking to you about this case?

19   A.   In 1994.

20   Q.   How did that happen, sir?

21   A.   I was in jail at the time.

22   Q.   Do you remember what for?

23   A.   It was for traffic and (pause).

24   Q.   Who came and talked to you?

25   A.   Robert Ecoffey and Abe Alonzo.

1    Q.    Did you know Robert Ecoffey from up on Pine Ridge at

2    all?

3    A.    No, but I had in common with his brother Hoaky Ecoffey

4    and his goon squad.  They jumped me in Rushville and I

5    remember the Ecoffey name there.

6    Q.    That was back in the '70s, or something?

7    A.    Yes, 1973.

8    Q.    Did you know Abe Alonzo?

9    A.    No.  First time was in 1994.

10   Q.    What happened then?

11   A.    I got ahold of my lawyer.  I had a family attorney

12   that my father knew and he'd been helping with my family

13   since I was 18.  And our family attorney knew this criminal

14   attorney; his name is Mr. Mulvihill.  And so I got in

15   contact with Mr. Mulvihill and he came to see me.

16   Q.    What made you decide to do that?  Was that because of

17   this case or because of your traffic deal or what?

18            MR. HANNA:  Objection; leading.

19            THE COURT:  Overruled.

20   A.    I don't recall.

21   Q.    (BY MR. MANDEL)   What happened when you got in touch

22   with Mr. Mulvihill?

23   A.    We had a discussion and we talked about -- wanted to

24   know what I wanted if I wanted to talk to the FBI along

25   with a marshal.

1   Q.   Did you agree to do that?

2   A.   Yes, I did.

3   Q.   Do you remember how that took place?  I will start

4   with:  do you remember where?

5   A.   It happened in -- took place at the Federal Building

6   in Denver.

7   Q.   Who was there, just as best you recall?  If you don't

8   recall, I understand.

9   A.   There was Mr. Robert Ecoffey; I don't believe Abe

10  Alonzo was there; I think he waited out in the hall or in

11  the hallway.  But Robert Ecoffey and maybe several FBI

12  agents.

13  Q.   Was Mr. Mulvihill there?

14  A.   Yes.

15  Q.   Do you remember, was anyone from U.S. Attorney's

16  office there?

17  A.   I don't recall.

18  Q.   Okay.  What took place?

19  A.   They had a proffer that was signed by Karen Schreier

20  and I believe it was Holder.

21  Q.   Could it be Holmes?

22  A.   Might be Holmes, yes.  I don't recall the name.

23          MR. HANNA:  Objection to the leading.

24          THE COURT:  Sustained as to Holmes; the Holmes

25  part is a stricken.  Ask your next question.

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

```
1    Q.   (BY MR. MANDEL)   What was the agreement that you

2    remember?

3    A.   I don't recall the specifics.  I don't recall.

4    Q.   Did you agree to talk about what happened?

5    A.   Yes.

6    Q.   Did they interview you about that?

7    A.   Yes, they did.

8    Q.   When you told them about what happened, did you tell

9    them everything?

10   A.   No.

11   Q.   What didn't you tell them about?

12   A.   Allen, Marshall, Mr. Marshall, Charlie Abourezk.

13   Q.   Why didn't you tell them about those things?

14   A.   I was fearful for my family.  I didn't trust no one

15   and I didn't want my family getting hurt; my father, my

16   family.

17   Q.   Were you in fear of these individuals?

18   A.   Yes.

19   Q.   Both of the ones you named?

20   A.   Yes.

21   Q.   Were you in fear of other individuals as well?

22   A.   Yes.

23   Q.   Can you tell us who?

24   A.   I did not trust anyone:  the government, police,

25   detectives, anyone.  I did not trust anyone anymore.
```

1   Q.   Were you afraid that talking about that would put you

2   at risk?

3   A.   Yes.

4           MR. HANNA:  Objection; leading.

5           THE COURT:  Sustained.  It may be stricken.  Ask

6   your next question.

7   Q.   (BY MR. MANDEL)   Had you be threatened by anyone?

8   A.   There had been an attempt on my life; there had been

9   attempt on my life.

10  Q.   Going back to '94, had you been threatened by anyone

11  at that time?

12  A.   They weren't really blatant threats, but kind of

13  something like innuendoes.

14  Q.   Innuendoes?

15  A.   Somewhat to that, yeah.  I did receive that from

16  everyone that was involved, I mean, wanted to be part of

17  this.  I have see one form of threat or another.

18  Q.   After you told them about this, did you get out of

19  jail?

20  A.   I have never been out of jail, no.

21  Q.   In 1994?

22  A.   1994 -- I got out of jail in 1996.  I was put in

23  prison, in federal prison, and without no charge.  I was in

24  El Reno, Oklahoma, in maximum security at the time, it was

25  maximum.  And I was placed there and I had to protect

1   myself there.  And my attorney finally got ahold of my

2   attorney, Mr. Mulvihill, and he asked me what I was doing

3   in maximum security federal prison.  So I said, "I have no

4   idea why I am here.  I don't know why.  I haven't been

5   charged.  Haven't been no charges, nothing."  So he spoke

6   to the U.S. Attorney and the U.S. Attorney -- so I got a

7   hold of him next day; he said call me back the next day, so

8   I called the back the next day.  I said okay.  The U.S.

9   Attorney will be bringing you back to Colorado.  I said,

10  "Okay."  I have to protect myself while I was in there.

11  Q.   Do you know a guy who worked for the Marshal Service

12  named Ricky Ianucci?

13  A.   Yes.

14  Q.   You knew Bob Ecoffey was the United States Marshal up

15  here in South Dakota at that time?

16  A.   I did not know he was a marshal.

17  Q.   Did a time come when were you transported up to South

18  Dakota to go around to the various scenes involved in this

19  case?

20  A.   Yes.

21  Q.   How did you come up here to South Dakota?

22  A.   After I got back from El Reno, they put me in Castle

23  Rock County Jail under another name.  They gave me another

24  name.  They put me in Castle Rock.  And my aunt used to

25  come see me so she could verify the name, name they gave

1    me.  One day Ecoffey comes up and gives me some clothes and

2    he wants me to go with him, and without having giving me a

3    chance to consult with my attorney.  I don't know if he

4    ever did or not.  He never told me.

5    Q.   So how did you come up to South Dakota at that time?

6    A.   At that time Ianucci and Ecoffey put me in a car and

7    they transport me.

8    Q.   Do you remember what date this was?

9    A.   I don't recall, but along the way they talk about this

10   Ianucci being on the force in Philadelphia.  It was like a

11   special unit where they take people out, right; certain

12   criminals, or whatever.  They kill me so they won't have to

13   bother going through the court system.  So Ecoffey asked

14   him:  Alonzo wants to know what it takes to be on this

15   special team.  And Ianucci tells him you have to have nine

16   certified kills, nine killings to be on this team.  So he

17   looks at me and said, "Well, you know, make a break for it.

18   You can run.  I have got a good shot at you."

19   Q.   Think he was trying to scare you?

20   A.   They have been doing this to me for a long time.  Many

21   people.

22   Q.   When you got up to South Dakota here, where did you

23   guys go?

24   A.   Pennington County Jail.

25   Q.   They put you there for the night?

```
 1    A.    Yes.

 2    Q.    Did you go somewhere the next morning?

 3    A.    Yes.

 4    Q.    Where did you go to?

 5    A.    They take me to the spot, to the place.

 6    Q.    The place where Anna Mae was killed?

 7    A.    Yes.

 8    Q.    Were you able to recognize it?

 9    A.    No, sir, I did not recognize it.

10    Q.    Did they know where it was because of where the body

11    had been found?

12    A.    Yes.

13    Q.    When they took you out there and showed it to you, did

14    it refresh your memory?  Were you able to recall the

15    terrain at that time?

16    A.    No, sir.

17    Q.    Did you go anyplace else with them?

18    A.    No.

19    Q.    That was the only location you went to?

20    A.    We might have gone to the apartment.  I don't recall,

21    though.

22    Q.    You are talking about up to Knollwood apartment there?

23    A.    Yes.

24    Q.    Mr. Looking Cloud, you are currently serving a life

25    sentence at the present time, is that correct?
```

```
 1    A.    That's correct.

 2    Q.    And you remember I was one of the prosecutors on your

 3    case, don't you?

 4    A.    That's right, that's right.

 5    Q.    Back when you were charged, you wouldn't agree to

 6    cooperate, would you?

 7    A.    No, sir, I would not cooperate.

 8    Q.    But you changed your mind, is that correct?

 9    A.    Yes, sir.

10    Q.    Sir, why did you change your mind?

11    A.    There have been many untruths; they let the truth lie

12    on the ground.  A lot of misinformation.  And I believe the

13    truth.

14    Q.    Sir, did you testify truthfully here today?

15    A.    Yes, sir, I have.

16    Q.    Do you recall, was there any promise made to you as to

17    what you get if you came in and testified?

18    A.    No, sir, there was no promises.

19    Q.    To be honest, you'd like something good to happen,

20    right?

21    A.    Yes, naturally.

22    Q.    But no promises have been made?

23    A.    No, sir.

24          MR. MANDEL:  No further questions, Your Honor.

25          THE COURT:  We will take a 15-minute recess at
```

```
 1    this time.
 2              (Recess taken.)
 3              THE COURT:  Bring in the jury, please.
 4              (Following proceedings in the presence of the
 5    jury.)
 6              THE COURT:  Please be seated.  You may proceed.
 7                       CROSS-EXAMINATION
 8    BY MR. HANNA:
 9    Q.   Mr. Looking Cloud, I am Danna Hanna.  You just told
10    Mr. Marshall -- excuse me -- Mr. Mandel and the Court and
11    the jury that you testified truthfully, is that right?
12    A.   Yes, sir.
13    Q.   And have you testified truthfully about everything or
14    just some things?
15    A.   Everything.
16    Q.   Okay.  It's your testimony that you got out of jail in
17    1996, right?
18    A.   Yes.
19    Q.   In Denver.  And Bob Ecoffey, United States Marshall
20    Ianucci, and Abe Alonzo picked you up in custody in Denver?
21    A.   Yes.
22    Q.   That was in 1995, wasn't it?
23    A.   In Castle Rock, yes.
24    Q.   And they drove you to the scene of the crime in South
25    Dakota from Colorado?
```

1   A.   Yes.

2   Q.   And during the course of that conversation, you

3   heard -- and was it the three of them in the car with you

4   or just was it Alonzo, Ecoffey and Ianucci in the car with

5   you?

6   A.   I don't recall, but I believe so.

7   Q.   And you recall United States Deputy Marshal -- you

8   recall Rick Ianucci saying to you or to the others that he

9   was a member of some law enforcement murder squad?

10  A.   Yes.

11  Q.   And as a member of this murder squad, they would take

12  out criminals who they didn't want to have to go through

13  the criminal justice system?

14  A.   Yes.

15  Q.   And by take out they meant murder, is that correct,

16  what you understood them to be talking about?

17  A.   From what I understand, yes.

18  Q.   And you heard Ianucci tell Alonzo and Ecoffey that in

19  order to be on this police murder squad, one had to have

20  nine kills?

21  A.   Yes, just to Abe Alonzo.

22  Q.   Ianucci said that to Abe Alonzo?

23  A.   Yes.

24  Q.   Abe Alonzo being Detective Abe Alonzo of the Denver

25  Police Department, right?

1   A.   Yes.

2   Q.   And Detective Alonzo then told you, "Why don't you

3   make a run for it and see if he can take you out," or words

4   to that effect?

5   A.   Words to that effect.  If you can run, if you want to

6   run.

7   Q.   And at some point -- that was in 1995, right?

8   A.   Yes.

9   Q.   And in 1996, law enforcement picked you up and took

10  you to a federal penitentiary in Oklahoma?

11  A.   Yes.

12  Q.   Nobody told you what the charges were?

13  A.   Yes.

14  Q.   And they put you in a maximum security prison?

15  A.   Yes.

16  Q.   In a federal penitentiary in Oklahoma, right?

17  A.   Right.

18  Q.   Didn't take you in front of a judge?

19  A.   No.

20  Q.   To this day do you have any idea why they took you to

21  a maximum security prison without ever seeing a judge or

22  telling why they were picking you up?

23  A.   No.

24  Q.   Nobody has ever told you.  How long were you in this

25  maximum security prison in El Reno, Oklahoma?

1    A.   I don't really remember, but it was a while.

2    Q.   A month, a year?

3    A.   Two or three months.

4    Q.   In this time you were held incommunicado by the

5    federal government, is that right?

6    A.   Somewhat, yes.

7    Q.   Nobody ever told you why you were sent immediately to

8    a federal prison rather than going to a court?  Nobody ever

9    told you that at any time in three months?

10   A.   That's right.

11   Q.   Now, you were asked by Mr. Mandel whether you got in

12   some trouble after you returned to Colorado after Anna Mae

13   Aquash was murdered.  Do you recall that?

14   A.   Yes.

15   Q.   You said something about you were arrested; sometimes

16   you had some cases, right?

17   A.   Right.

18   Q.   As a matter of fact, you have been a defendant in 41

19   criminal cases in Colorado alone, correct?

20   A.   Yes.

21   Q.   That's right, isn't it?

22   A.   That's right.

23   Q.   Done time in prison in Colorado, haven't you?

24   A.   Yes, sir.

25   Q.   Did you do some time in Florida, too?

```
 1    A.    Yes, I did.

 2    Q.    How long were you in prison in Florida?

 3    A.    Six months.

 4    Q.    Wasn't that an aggravated assault charge?

 5    A.    Yes.

 6    Q.    Possession of a firearm?

 7    A.    Yes.

 8    Q.    Now, today you don't even remember or know -- didn't

 9    you testify that when you went to this house where you say

10    you saw Charlie Abourezk that you don't even know now if

11    that was on the Rosebud Reservation, is that right?

12    A.    I don't recall.

13    Q.    So you don't recall whether that was in Rosebud or on

14    the Rosebud Reservation or even where it was, is that your

15    testimony?

16    A.    I don't recall, but I think I do remember something,

17    but I do recall something that made me remember it was

18    Rosebud.

19    Q.    You recall something, but you don't remember what you

20    recalled?

21    A.    Exactly.

22    Q.    Now, you remembered it was a building in the distance

23    that you now think was a hospital, is that right?

24    A.    Yes.

25    Q.    Somebody told you it was a hospital, right?
```

1    A.    Yes.

2    Q.    In 2003, you remembered the house you stopped at was

3    in Rosebud, South Dakota, correct?  When you spoke to

4    Robert Ecoffey after you were arrested on March 27, 2003,

5    you told him and Detective Alonzo that you stopped outside

6    of a house in Rosebud, right?

7    A.    I don't recall.

8    Q.    You recall seeing a video at your trial of your

9    conversation with Detective Alonzo and Robert Ecoffey,

10   don't you?

11   A.    I don't recall too much.  I have been in the USP

12   system past since 2003, 2004.

13   Q.    You have been in the -- I'm sorry?

14        THE COURT:  Counsel, remember, let the witness

15   finish answering the question because the court reporter

16   can't take down two people talking at one time.

17   Q.    Please, if I cut you off, please finish your answer.

18   A.    I don't recall.

19   Q.    You just said you don't recall Exhibit No. 45 in your

20   trial here six years ago when they played a video of you

21   making a statement answering questions to Robert Ecoffey?

22   You don't remember that being played at your trial?

23   A.    There was a video; I remember they showed a video,

24   yes.

25   Q.    And do you recall that in that video you told Robert

1    Ecoffey that you, and Theda Clarke, and John Boy, with Anna

2    Mae in the car, stopped in Rosebud?

3    A.    Yes.

4    Q.    And do you recall saying in 2003 that you all drove

5    from Rapid City, South Dakota, through the Pine Ridge

6    Indian Reservation to Rosebud, South Dakota?

7    A.    Yes.

8    Q.    And didn't you tell Detective Alonzo and Ecoffey that

9    after Theda Clarke and John Graham came out of that house

10   in Rosebud, you all drove directly up to the spot in the

11   Badlands where Anna Mae Aquash was murdered?

12   A.    Yes.

13   Q.    That's what you said in 2003, wasn't it?

14   A.    Yes.

15   Q.    You recall a conversation you had in the year 2000

16   with Kamook Banks and Troy Lynn Yellow Wood when you got

17   out of jail in the middle of December 2000?

18   A.    Yes.

19   Q.    And you and Kamook Banks and Troy Lynn spent about six

20   hours together, didn't you, after you got out of jail?

21   A.    Must have been about six hours; I don't recall.

22   Q.    You do know now that that conversation was recorded by

23   Kamook Banks, don't you?

24   A.    At the time I didn't.

25   Q.    I know that.  I am asking you --

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    A.    A lot of things I don't recall at the time.   But later

2    on I find out that we was in Rosebud and, you know, later

3    on I find all this out.

4    Q.    The question I asked you is:   you now know that Kamook

5    Banks was secretly recording your conversation with her

6    that you had in December of 2000 in the presence of Troy

7    Lynn Yellow Wood?

8    A.    I didn't know she was recording this.

9    Q.    I know that.  My question is:   you now know that was

10   recorded?

11   A.    Yes, I do.

12   Q.    In fact, you have listened to the tape, haven't you?

13   A.    I have not listened to the tapes, but I have looked at

14   the transcript.

15   Q.    Okay.  So you read the transcript that was made of

16   what you said and Troy Lynn said and Kamook Banks said in

17   that conversation back in Denver in December of 2000,

18   right?

19   A.    Yes.

20   Q.    In that conversation you said to Kamook Banks that you

21   all drove from Rapid City to Rosebud, South Dakota, through

22   the Pine Ridge Reservation to Rosebud, South Dakota, right?

23   A.    Yes.

24   Q.    And you told Kamook Banks in Rosebud, South Dakota,

25   the car was parked outside of the house and you and Anna

1   Mae stayed in the car while John Graham and Theda went into

2   the house.  Isn't that what you told Kamook Banks in

3   December 2000?

4   A.   No.

5   Q.   Isn't that what you told Kamook Banks in December

6   2000?   Did you say and did she say these words on the 16th

7   of December in the year 2000?  Kamook.

8           MR. MANDEL:  Page?

9           MR. HANNA:  Page 94.

10  Q.   Kamook Banks.  Question:  Did you go down the

11  interstate, maybe?  By the way, excuse me.  Question:  Did

12  you go down the interstate, maybe?  Pause.

13           Troy Lynn.  Or did you go the back way?

14           Looking Cloud.  No, we went through Pine Ridge.

15           Kamook Banks.  Question to you.  From Rapid City

16  to --

17           Looking Cloud.  Yeah.

18           Kamook Banks.  Pine Ridge.  Did you guys stop in

19  Pine Ridge?

20           Your answer:  No.  I think.

21           Kamook Banks.  Question to you.  Did you go

22  straight then to -- over to Rosebud to Bill Means' house?

23           Your answer.  I don't even know where Bill Means

24  lives.  I don't know which house it was.

25           Kamook Banks to you.  But it was in Rose -- you

1    went to Rosebud, though?

2            Looking Cloud answers.  Yes.  Is that what you

3    said and were those words said to you on December 16, 2000

4    in Denver.

5    A.   Yes.  We went through Pine Ridge Reservation on our

6    way to Rosebud.

7    Q.   The question I asked you was:  isn't that what you

8    said to Kamook Banks when she was secretly recording you on

9    December 16, 2000?

10   A.   I don't recall, but I looked at the transcript once or

11   twice.

12   Q.   You are not denying you said that back then to her,

13   are you?

14   A.   I don't deny that she was there.

15   Q.   Even though this has been recorded, right?

16   A.   Yes.  I would like to hear the recording.

17   Q.   Do you remember in 1988 in Denver going to a concert

18   at which John Trudell and Midnight Oil performed?

19   A.   Yes.

20   Q.   You went with Troy Lynn Yellow Wood, right?

21   A.   Troy Lynn Yellow Wood and another lady, one of her

22   friends; I can't remember her name right at the moment.

23   Q.   Afterwards you all had, that is, you and Troy Lynn had

24   a conversation with John Trudell, right?

25   A.   Yes.

1    Q.   John Trudell was a respected national spokesman for

2    the Native American Movement in the early 1970s, wasn't he?

3    A.   I don't know about respected; but, yes, he was a

4    chairman.

5    Q.   He was a national spokesman for the Native American

6    Movement in the 1970s, wasn't he?

7    A.   I don't know; but, yes, probably.

8    Q.   And you talked to him about what had happened to Anna

9    Mae Aquash when you talked to him back in 1988, didn't you?

10   A.   No, I did not say a word to him.

11   Q.   You didn't say anything at all to John Trudell about

12   what happened to Anna Mae Aquash?

13   A.   That's right.

14   Q.   Didn't you tell John Trudell?

15        MR. MANDEL:  I object to this on the grounds of

16   hearsay.  This is a statement of John Trudell, not the

17   witness.

18        MR. HANNA:  I am laying foundation for a prior

19   inconsistent statement.

20        THE COURT:  We have an objection outstanding.

21        MR. HANNA:  I misunderstood you.  I thought you

22   said overruled, Judge.  May we approach?

23        THE COURT:  No, not yet.  Sustained on foundation

24   grounds.

25   Q.   (BY MR. HANNA)   In your conversation that was

1    recorded between yourself and -- strike that.  You had

2    been -- in December 1975 you had been to Rosebud many

3    times, hadn't you, before that particular night?

4    A.   I don't recall.

5    Q.   Do you recall telling Kamook Banks in your recorded

6    conversation December 16, 2000, that you had been to

7    Rosebud many times; the town of Rosebud?

8    A.   Yes.

9    Q.   Mr. Looking Cloud, 33 years ago, one winter morning

10   around dawn you, and John Graham and Anna Mae Aquash were

11   in a field in the Badlands, correct?

12   A.   I don't believe it was a field.  But, yes.

13   Q.   Out there in that field you handed John Graham a .32

14   caliber handgun, didn't you?

15   A.   No, sir.

16   Q.   You handed John Graham a .32 caliber handgun and you

17   nodded at Anna Mae Aquash, didn't you?

18   A.   No, sir.

19   Q.   John Graham shot her in the head while you watched,

20   right?

21   A.   Yes.

22   Q.   Now, are you -- in 1994 were you very familiar with

23   handguns?  Have you had a lot of experience with handguns;

24   knew one from the other?

25   A.   No.

1    Q.   But when you talked to the investigating federal

2    officers at the United States Attorney's office in Denver

3    on November 17, 1994, in the presence of your attorney and

4    Special Agent Graff and others, you told them it was a .32

5    caliber handgun that killed Anna Mae Aquash, didn't you?

6    A.   Yes.

7    Q.   You knew it was a .32 caliber handgun because it was

8    your .32 caliber handgun, isn't that true?

9    A.   No.

10   Q.   Now, sir, you know a man named Richard Two Elk?

11   A.   Yes, I do.

12   Q.   You knew him from back in the Denver AIM days in the

13   early '70s, right?

14   A.   Yes.

15   Q.   And in 1994, after he first started being questioned

16   about what happened to Anna Mae Aquash by law enforcement,

17   you called Two Elk to ask him his advice, didn't you?

18   A.   I called him.

19   Q.   You called him?

20   A.   Yes.

21   Q.   To discuss the fact that the law was asking you

22   questions, right?

23   A.   I asked him, yes.

24   Q.   And between 1994 and 2003 when you were arrested, you

25   had several conversations with Richard Two Elk, didn't you?

1    A.   Not about the case.

2    Q.   You did discuss the case with him on occasion, didn't

3    you?

4    A.   No.

5    Q.   Sir, from 1994 to 2003, didn't you tell your old

6    friend Richard Two Elk that when you all got out to that

7    field in the Badlands and got out of the car you, John Boy,

8    and Anna Mae Aquash, you handed a gun to John Boy Patton?

9    A.   No.

10   Q.   And didn't you tell Richard Two Elk that you handed a

11   gun to John Patton, John Boy, and that you nodded at Anna

12   Mae as you did so?

13   A.   No, I didn't.

14   Q.   And that he then shot her with the gun that you had

15   given him.  Did you say that to Richard Two Elk?

16   A.   No, I didn't.

17   Q.   Didn't you say it to Richard Two Elk on at least half

18   a dozen occasions in conversations between 1994 and 2003?

19   A.   No, I never said no such thing.

20   Q.   You were there in 2004 and you heard Richard Two Elk

21   testify, didn't you?

22   A.   Yes, I did.

23   Q.   And he was sitting where you are sitting right now,

24   isn't that true?

25   A.   That's true.

1   Q.   And you heard him testify as a government witness in

2   that case, correct?

3   A.   Correct.

4   Q.   And in answer to questions from the federal prosecutor

5   Richard Two Elk -- you heard Richard Two Elk testify that

6   you had told him you gave John Boy the gun that he used to

7   shoot Anna Mae Aquash.  You heard him say that, didn't you?

8   A.   Yes, I heard him say that.

9   Q.   And you knew that was very important evidence in your

10  case, correct?

11  A.   Yes.

12  Q.   You knew that if the jury accepted that testimony,

13  then it proves that you intentionally intended to help

14  murder Anna Mae Aquash?

15  A.   No.

16  Q.   You knew that that was what was being argued though,

17  correct?

18  A.   My attorney advised me not to say anything.

19  Q.   I didn't ask what your attorney said.  I am asking

20  you:  you knew at the time in '04.

21  A.   I mean, yeah, whenever the trial was; '03, right?

22  Q.   Trial was -- you are right.  Excuse me.  2003.

23  A.   Right.

24  Q.   You were arrested in 2003 and you were tried in 2004,

25  right?

1     A.    Right.

2     Q.    In 2004, six years ago, you heard Two Elk testify that

3     you admitted to him that you provided the murder weapon to

4     John Graham moments before she died?

5     A.    I never said nothing like that to Richard Two Elk.

6     Q.    But that's what he testified in the trial, correct?

7     A.    That's correct.

8     Q.    And you knew that that testimony was very bad for you,

9     right?

10    A.    Yes.

11    Q.    And so four years into your life sentence you decided

12    that it was important for you when you testify in this case

13    to put that gun in somebody else's hand, right?

14    A.    No.

15    Q.    You filed an appeal that was decided by the Eighth

16    Circuit Court of Appeals in 2005, right?

17    A.    Yes.

18    Q.    And basically your primary argument in that appeal was

19    that the evidence was insufficient to prove that you

20    knowingly sought to help kill Anna Mae Aquash, right?

21    A.    I never gone through the appeal; I never seen, I never

22    talked to him Mr. Gilbert about the appeal.  I have no idea

23    what he wrote.

24    Q.    You know you lost your appeal.

25    A.    He never consulted me on the appeal.  We have never

1    gone through it; I have no idea.

2    Q.    You don't even know if your appeal has been --

3    A.    I do know that that it was affirmed.

4    Q.    The conviction was affirmed your life sentence was

5    affirmed, right?

6    A.    Yes.

7    Q.    Now you read that opinion by Eighth Circuit, haven't

8    you?

9    A.    I read it once, yes.

10   Q.    Okay.  And you know that the Eighth Circuit decided

11   that the testimony of Two Elk that you handed the gun to

12   John Graham proved your intentional specific intent to help

13   kill Anna Mae Aquash, right?

14            MR. MANDEL:  Your Honor, I object.  This is

15   seeking a legal opinion from this witness.

16            THE COURT:  Sustained.

17   Q.    (BY MR. HANNA)   Now, you have a pending motion to set

18   aside your conviction, correct?

19   A.    I don't know, sir.

20   Q.    Mr. Looking Cloud, you have two attorneys representing

21   you right now, don't you?

22   A.    Yes.

23   Q.    And one of them is Barry Bachrach from Boston,

24   correct?

25   A.    Yes.

1   Q.   He's in the courtroom today, isn't he?

2   A.   Yes.

3   Q.   Point him out for us.

4   A.   Right there.

5   Q.   Which one is Mr. Bachrach?  Would you describe what

6   he's wearing, what row he is sitting in?

7   A.   Blue shirt, black suit.

8   Q.   Is that Mr. Bachrach sitting in the front row, is that

9   right?

10   A.   That's right.

11   Q.   And is it your claim that no, you don't know whether

12   or not you have a pending motion to set aside your

13   conviction?

14   A.   I may have, yes.

15   Q.   You may have?

16   A.   Yes.

17   Q.   You know you have, right?

18   A.   I was never been -- I don't know.  I really don't

19   know.

20   Q.   Tell me, is it your -- did you have a gun when you

21   left Denver that day when you all took Anna Mae Aquash to

22   the Troy Lynn house?

23   A.   No.

24   Q.   You know Theda regularly carried a gun in her car,

25   don't you?

1    A.    She might, yes.

2    Q.    In fact, in 2008 you knew that in 2008 when you spoke

3    to federal investigators about what happened to Anna Mae

4    Aquash in Rapid City, you told them Theda Clarke always

5    carried a gun, right?

6    A.    I don't recall.

7    Q.    You came from federal prison in Pollock, Louisiana, in

8    August and you spoke to federal investigators here in Rapid

9    City on August the 19, 2008, didn't you?

10   A.    Yes.

11   Q.    And when you were telling them your account of being

12   in Richard Marshall's bedroom and seeing Theda Clarke get a

13   gun from him, didn't you tell them you didn't think

14   anything about it because Theda Clarke always had guns?

15   A.    Yes.

16   Q.    That's what you told them on that day, right?

17   A.    Right.

18   Q.    How about John Boy; did John Boy regularly carry a

19   gun, too?

20   A.    I never met John Boy; I never heard of him.  That was

21   the first time I ever came across.

22   Q.    I'm sorry I interrupted.  You never heard -- you never

23   saw John Boy Graham?

24   A.    I assumed they were both traveling together.

25   Q.    You never saw John Boy Graham before the day you

1    walked over to Anna Mae Aquash -- excuse me -- Troy Lynn

2    Yellow Wood's house and saw Anna Mae Aquash for the first

3    time, is that right?

4    A.    That's right.  That was my first time.

5    Q.    You knew Angie Begay, didn't you?

6    A.    Yes.

7    Q.    You were pretty good friends with Angie Begay?

8    A.    I knew her, yes.

9    Q.    You saw her sometimes over there at Troy Lynn's house?

10   A.    Right.

11   Q.    You often visited Troy Lynn, right?

12   A.    Not often.

13   Q.    But you never saw John Boy Graham over at Troy Lynn's

14   place or any place else?

15   A.    No.

16   Q.    And isn't it true you and John Boy and Angie used to

17   hang out together?

18   A.    No.

19   Q.    Isn't it true that you and John Boy knew each other in

20   Denver; used to party together?

21   A.    No.

22   Q.    The first time you ever saw John Boy Graham was when

23   you walked into the basement at Troy Lynn Yellow Wood's

24   house, is that right?

25   A.    That's right.

1    Q.   So did you see a gun at Troy Lynn Yellow Wood's house?

2    A.   No.

3    Q.   Did you see a gun on anybody's possession between

4    Denver and Rapid City?

5    A.   No.

6    Q.   Did you see a gun in anybody's possession at any time

7    before you reached Allen, South Dakota?

8    A.   No.

9    Q.   Is it your testimony, sir, that the first time you saw

10   a gun or became aware that anybody had a gun was at Richard

11   Marshall's house in Allen, South Dakota?

12   A.   Yes.

13   Q.   Now, when you did your proffer session in front of

14   federal authorities in December -- November 17, 1994, they

15   asked you when was the first time you saw a gun, right?

16   You remember discussing that general topic?

17   A.   I don't recall.

18   Q.   You do know that that proffer session was

19   tape-recorded, correct?

20   A.   Yes.

21   Q.   And you have read the transcript of that proffer

22   session, haven't you?

23   A.   Yes.

24   Q.   Now, you say did you tell the truth when you spoke to

25   those agents on November 17, 1994, at your proffer session

```
1     at the United States Attorney's office?

2     A.   To the questions, yes.

3     Q.   You answered every question truthfully?

4     A.   I don't recall.

5     Q.   Well, let me ask you if you recall this:  Special

6     Agent Jim Graff of the FBI was there, wasn't he?

7     A.   I don't know him.

8     Q.   Well, you do remember the FBI Agent asking you?

9     A.   There were a few -- several FBI agents.

10    Q.   Did one of them ask you this question and did you give

11    this answer?  "I will kind of ask it again.  With regard to

12    the gun, Arlo, you have already stated to us that you know

13    that John Boy obviously had it.  That he shot her with it.

14    But when was it -- I am trying to find out when it was that

15    you first noticed that he had this gun or that you became

16    aware of the gun, or that anybody had the gun."

17         And did you give this answer to that question?

18    "When we was out on the road there, when we was on that

19    road that morning."  Were you asked that question and did

20    you give that answer on November 17?

21    A.   I do not recall.

22    Q.   Were you then asked this question by Agent Graff and

23    did you give this answer?  "Okay.  Was it before you got to

24    that house where John and Theda got out or do you

25    remember?"
```

1          Your answer.  "I think it might have been, yeah."

2     Were you asked that question and did you give that answer?

3     A.   I don't recall.

4     Q.   Were you then asked this question by Agent Graff and

5     did you give this answer?  "Where was it that you saw the

6     gun?   Was it in the car?"

7          Your answer.  "Yeah."

8     Q.   Was that the question and that answer?

9     A.   I don't recall.

10    Q.   In fact, you saw a handgun.  Were you asked this

11    question by Agent Graff in that conversation?  "Okay.  I

12    want to go over again how it was that you knew it was a .32

13    caliber revolver.  You have said it was silver and you said

14    you knew it was a revolver rather than a pistol because it

15    had the round chamber."

16         You say, "Yes."  It's not recordable if you nod.

17    Yes or no.  Then Ecoffey came in and said, "Didn't you say

18    earlier that John Boy told you it was a .32?"

19         Your answer, "Uh-Huh, yeah."  Were those

20    questions asked of you and did you give that answer?

21    A.   I don't recall.

22    Q.   Did John Graham tell you that the gun was a .32?

23    A.   No.

24    Q.   Now, according to what you told the jury here today

25    you saw -- you had a -- after John Graham shot Anna Mae

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    Aquash he handed the gun to you, right?

2    A.   I asked for it, yes.

3    Q.   You asked for the gun and he handed the gun to you,

4    right?

5    A.   Right.

6    Q.   He was returning your gun to you that you had just

7    handed to him, isn't that right?

8    A.   No.

9    Q.   Isn't that why John Graham gave you the handgun after

10   he shot Anna Mae Aquash in the head?

11   A.   No.

12   Q.   No?

13   A.   No.

14   Q.   Did he ever tell you it was a .32?

15   A.   No.

16   Q.   So you had that handgun in your hand just long enough

17   to fire it off five times, then you gave it back to John

18   Graham, is that your testimony?

19   A.   Yes.

20   Q.   And you were not at all familiar with handguns in

21   December of 1975, is that right?

22   A.   Yes.

23   Q.   Yet you knew that it was a .32 caliber pistol when you

24   spoke to federal officers on November 17, 1994, right?

25   A.   Yes.

```
1    Q.   Did you ever go to Theda Clarke's bar up in

2    Keenesburg?

3    A.   Yes.

4    Q.   And you knew that she kept a gun in the bar, didn't

5    you?

6    A.   No.

7    Q.   So your testimony is the first time you saw a gun was

8    at Richard Marshall's house, right?

9    A.   Yes.

10   Q.   And the next time you saw a gun a police officer with

11   flashing red lights was behind you on Highway 44 as you

12   were heading out to Wanblee and Theda Clarke then gave you

13   a gun?

14   A.   Yes.

15   Q.   And the next time you saw a gun was when John Boy

16   Graham pulled one out and shot Anna Mae Aquash with it,

17   right?

18   A.   That's right.

19   Q.   Now, when you were driving along heading toward

20   Wanblee on 44 just before you all stopped by that field,

21   and you saw a police car behind you with red flashing

22   lights, Anna Mae Aquash was in the back of that hatch back,

23   right?

24   A.   Yes.

25   Q.   And she was tied up at that time?
```

1    A.    I don't recall.

2    Q.    She was in the back; was she sitting up, laying down,

3    or what?

4    A.    I don't know.

5    Q.    She was in the back of the hatch back, right?

6    A.    Yes.

7    Q.    When you saw these flashing lights, were you

8    concentrating on that police officer, is that right?

9    A.    That's right.

10   Q.    You were worried maybe you were speeding, correct?

11   A.    Yes.

12   Q.    And were you also worried that if he pulled you over,

13   there was a kidnap victim in the back of your car?

14   A.    I don't know; probably.

15   Q.    You were probably worried about if you got pulled over

16   by a police officer?

17   A.    I don't know.

18   Q.    Sorry?

19   A.    I don't recall.

20   Q.    You don't recall whether you were worried about that?

21   A.    Yes, I was mostly on the red light.

22   Q.    And you were mostly concentrating on the red light

23   because were you afraid that police officer might pull you

24   over, right?

25   A.    Yes.

1    Q.   And if he pulled you over he would probably notice

2    there was a woman in the trunk or in the back hatch back

3    space, right?

4    A.   Right.

5    Q.   You were worried she might say something like,

6    "Officer, these people are going to kill me," right?

7    A.   No.

8    Q.   You weren't at all worried about what Anna Mae Aquash

9    might say if a police officer behind you pulled you over?

10   A.   I don't know.

11   Q.   You knew, didn't you, that you helped kidnap a woman

12   in Denver a couple of days earlier?

13   A.   All my business was to drive from Denver to Rapid

14   City.

15   Q.   You knew you helped take her out of that house against

16   her will, didn't you?

17   A.   She just -- she went; she walked.

18   Q.   She walked with her hands tied together, didn't she?

19   A.   Yes.

20   Q.   So that gave you some indication that she was going

21   against her will, correct?

22   A.   Yes, I would assume, yes.

23   Q.   And you knew enough about the law to know that when

24   you take somebody from one place to another against their

25   will, that is a crime called kidnapping, right?

1   A.   Yes.

2   Q.   So you knew that if that cop pulled you over, you

3   could go to prison, right?

4   A.   That was not on my mind.

5   Q.   It was not on your mind.  Were you afraid of getting a

6   speeding ticket?

7   A.   No.

8   Q.   You were afraid that if that cop pulled you over, the

9   three of you were all guilty of, one, harboring a federal

10   fugitive; and two, kidnapping, right?

11   A.   I don't know.

12   Q.   At the time when Theda Clarke handed you that gun, you

13   knew that was for the purpose of using it on the police

14   officer if he pulled you over, correct?

15   A.   No.

16   Q.   She didn't say anything other than, "Take this Arlo,"

17   huh?

18   A.   Yes.

19   Q.   After the police officer turned up toward Interior,

20   you handed the gun back to Theda Clarke?

21   A.   She asked for the gun back.

22   Q.   At no time did you ever see Theda Clarke or anybody

23   else load a gun, did you?

24   A.   No.

25   Q.   At no time did you ever see Theda Clarke give a gun to

1   John Graham, did you?

2   A.   I think they were both in the front.

3   Q.   Both in front.  My question was:  you did not see

4   Theda Clarke give a gun to John Boy Graham, did you?

5   A.   No.

6   Q.   So the first time that you became aware that John Boy

7   Graham had a gun is when he pulled it out and shot Anna Mae

8   Aquash in the head with it?

9   A.   Yes.

10  Q.   And until that -- and that came as big surprise to

11  you, didn't it?

12  A.   Yes.

13  Q.   You had no idea -- is it your testimony you had no

14  idea that John Graham or Anna Mae Aquash meant to kill --

15  excuse me -- John Graham or Theda Clarke meant to kill Anna

16  Mae Aquash?

17  A.   Yes.

18  Q.   You had no idea that was going to happen, is that

19  right?

20  A.   That's right.

21  Q.   Nobody -- what did you think you were doing out there

22  in that field when the sun was rising that morning?

23  A.   We were going to scare her, or something.

24  Q.   Scare her or something.  So if you had no idea -- so

25  you had no intent to help anybody kill Anna Mae Aquash, is

1    that right?

2    A.    That's right.

3    Q.    So you are innocent of the murder that you were

4    convicted of; is that what you are telling the jury?

5    A.    I had a wrongful conviction.

6    Q.    You had a wrongful conviction because you had no

7    intent to kill Anna Mae Aquash, is that right?

8    A.    That's right.

9    Q.    Have you told that to the federal prosecutors that you

10   are innocent, that you had no intent to kill Anna Mae

11   Aquash?

12   A.    I said that to many people and I am innocent.

13   Q.    I didn't ask you that.  At any time between when you

14   were brought back to Rapid City from Pollock, Louisiana,

15   and spoke to federal prosecutors on August 19, 2008, until

16   today, did you tell Mr. Mandel that you had no intent to

17   kill Anna Mae Aquash or help get her killed?

18   A.    I answered his questions truthfully.

19   Q.    No.  My question was:  did you ever tell Mr. Mandel

20   that you had no intent to help kill Anna Mae Aquash?

21   A.    I never said no such thing, I don't think.

22   Q.    You don't think?

23   A.    But I said I was innocent.

24   Q.    You said you were innocent?

25   A.    I may have said I was innocent.

1   Q.   May have said you were innocent.  So you have never

2   admitted to Mr. Mandel or anybody from the government that

3   you intentionally helped murder Anna Mae Aquash, have you?

4   A.   Yes.  No one has ever mentioned that anyone was going

5   to get killed; not to me no one ever said anything.

6   Q.   And you have told that to Mr. Mandel and the

7   government?

8   A.   I told that to many people.

9   Q.   Including Mr. Mandel and the government, yes?

10   A.   Yes.

11   Q.   They knew before you came in here that's what your

12   testimony is going to be, right?

13   A.   Yes.

14   Q.   Now, when you did your proffer session November 17,

15   1994, you did not say anything about stopping at Richard

16   Marshall's house, did you?

17   A.   Yes.

18   Q.   Yes you did say something about Richard Marshall or no

19   you did not?

20   A.   No, I did not.

21   Q.   You did not say anything about stopping in Allen, did

22   you?

23   A.   No.

24   Q.   You did not say anything about anybody getting Theda

25   Clarke a gun, did you?

1    A.    I'm sorry, I didn't hear.

2    Q.    I will repeat it.  On November 17, 1994, when you were

3    first questioned in your proffer session with the United

4    States Attorney's office, you never said anything about

5    anybody giving Theda Clarke a gun or Theda Clarke getting a

6    gun from anybody, did you?

7    A.    Yes, I never said anything.

8    Q.    Then they questioned you -- federal officers

9    questioned you again around a few months later like in

10   January 1995, right?  Do you recall?  Let me ask you this

11   question.  I will give you some more details.  Somewhere

12   around -- this would be after your proffer session a couple

13   months or month later, didn't you and your attorney,

14   Mr. Mulvihill, again meet with you and Detective Abe Alonzo

15   of the Denver Police Department and United States -- and

16   Rick Ianucci, and didn't you again basically go through

17   what happened to Anna Mae Aquash?

18   A.    I don't recall, no.

19   Q.    You didn't.  Do you recall whether or not you never

20   said anything at all the second time you were questioned by

21   police in detail about this and made statements about

22   either Richard Marshall, or stopping in Allen, or anybody

23   giving Theda Clarke a gun?

24   A.    That's right.

25   Q.    You never said anything about that, did you?

1    A.    No.

2    Q.    Actually, the first time they spoke to you, Detective

3    Alonzo and Mr. Ecoffey spoke to you in the Denver jail on

4    September 6, 1994, they asked -- they told you, "We know

5    you are involved in the Anna Mae Aquash murder and you

6    should cooperate and tell us what happened," right?

7    A.    Yes.

8    Q.    At that time you said, "I have never met Anna Mae

9    Aquash," didn't you?

10   A.    Yes.

11   Q.    You said, "I don't know anything about Anna Mae Aquash

12   or how she died," right?

13   A.    Right.

14   Q.    And you said, "I was in Florida at the time," right?

15   A.    Right.

16   Q.    Then they caught you in a lie, correct?  As a matter

17   of fact, didn't they show you a police report showing that

18   you were in Denver around Troy Lynn's house in December of

19   1975, do you recall?

20   A.    I recall I lost a lot of ID.

21   Q.    And they showed you a police report showing that you

22   were near -- the cop had talked to you near the Irving

23   residence on or around December 13, 1975, and they knew

24   they caught you in a lie, right?

25   A.    I don't recall.

1    Q.    Then Detective Alonzo told you that you had some

2    pending charges and if you should decide to cooperate and

3    tell what happened, that he might be able to work something

4    out with the district attorney, right?

5    A.    Right.

6    Q.    Those charges weren't traffic charges, were they, that

7    you were in on?

8    A.    No.

9    Q.    They were assault on a police officer, correct?

10   A.    Correct.

11   Q.    It was a felony assault on a police officer that you

12   were facing?

13   A.    That's correct.

14   Q.    So you and Mr. Mulvihill got together and in the hopes

15   of getting that case dismissed you went in and talked to

16   federal agents on November 17, 1994, right?

17   A.    Right.

18   Q.    In fact that -- I'm sorry?

19   A.    That's correct.

20   Q.    In fact, that felony charge of assaulting a police

21   officer was in fact dismissed, correct?

22   A.    I don't recall.

23   Q.    You don't recall going to prison for assaulting a

24   police officer, do you?

25   A.    No.

```
1    Q.   Now, the third time that you spoke to federal

2    investigators about Anna Mae Aquash was on July 25, 1995,

3    when United States Marshal Robert Ecoffey, Deputy United

4    States Marshal Rick Ianucci, and Detective Abe Alonzo took

5    you from Rapid City to the Pine Ridge Indian Reservation,

6    is that right?

7    A.   Right.

8    Q.   And out to the spot where you saw Anna Mae Aquash

9    murdered, correct?

10   A.   Correct.

11   Q.   And didn't you -- did you tell them where they had

12   gone -- where you all had gone back in 1975 with Anna Mae?

13   A.   They took me.  I don't remember where it was.

14   Q.   So they were taking you out to various places; you did

15   not take them or direct them, is that your testimony?

16   A.   That's correct.

17   Q.   Didn't you tell them that the United States Marshal

18   Ianucci, Abe Alonzo, and United States Marshal Ecoffey,

19   that from Rapid City you drove down through Sharps Corner

20   on the reservation, and onto Kyle, South Dakota; and from

21   Kyle, South Dakota, you went to Potato Creek Housing area

22   where you ran out of gas, so you stopped at the Ethyl Black

23   Crow residence, and then you went to Wanblee and drove to

24   the junction of Highway 44 and 73, then you went up to the

25   spot where Anna Mae Aquash got killed?
```

1   A.   I don't recall.

2   Q.   You recall -- you say after you left Allen you went up

3   to Potato Creek Housing out in -- not too far from Allen,

4   right?  Potato Creek is a little community not too far from

5   Allen on the Pine Ridge Reservation, right?

6   A.   Right.

7   Q.   And your grandmother Ethyl Black Crow lived there,

8   right?

9   A.   Right.

10  Q.   You stopped there and you got her permission to siphon

11  some gas, right?

12  A.   Right.

13  Q.   So you got your grandmother up after midnight and

14  asked her if you could siphon some gas?

15  A.   Yes.

16  Q.   Did she ask you about the woman that was in the back

17  of the hatch back and what she was doing there?

18  A.   No.

19  Q.   Now, when you, and John Boy, and Anna Mae Aquash were

20  in that field in the last few minutes of her life, it was

21  going right around dawn, wasn't it?

22  A.   Yes.

23  Q.   Sky was just getting blue over the Badlands, right?

24  A.   Right.

25  Q.   So that was probably around 7:00 o'clock in the

1    morning, right?  6:00 or 7:00 o'clock in the morning,

2    right?

3    A.   Right.

4    Q.   And you told the jury you stopped in Allen, South

5    Dakota around 11:30, around midnight?

6    A.   Right.

7    Q.   So what did you all do for those six hours between the

8    time you left Allen and killed Anna Mae Aquash an hour

9    later -- six hours later?

10   A.   I don't recall.

11   Q.   You just drive around, cruise around South Dakota?

12   A.   I don't recall.

13   Q.   I presume -- isn't it true after you left Rosebud it

14   took you about one hour to get out to the Badlands?

15   A.   Was that a question?  I'm sorry.

16   Q.   Yes, it is, sir.

17   A.   What was it?

18   Q.   My question is:  after you left that house where Theda

19   Clarke and John Boy Graham went in there, you all drove to

20   directly up to the Badlands in a journey that took about

21   one hour, right?

22   A.   No.  We went to Allen.

23   Q.   You went to Allen around 11:00 o'clock or so at night,

24   11:30, sometime around midnight, before midnight?

25   A.   It might have been somewhere around there; I don't

1    recall what time.  I don't know.

2    Q.   You know that it makes no sense at all that you were

3    there --

4    A.   You don't know; you can't tell time, you know.  No one

5    is asking for what time it is.

6    Q.   You told the jury around 11:30, didn't you?

7    A.   Yes, and that's what I read.  There's what I read in

8    the Cleo Marshall -- that's what she said.  I assume it's

9    11:30.

10   Q.   So your testimony is tailored after other things after

11   other things other people have said that you read about in

12   trial, right?

13   A.   No.  Just the time on Cleo's.

14   Q.   Well, in 2003 -- when you arrested on March 27, 2003,

15   that was two days after your 50th birthday, right?

16   A.   That's right.

17   Q.   And Mr. Ecoffey asked you what happened and you went

18   through a story about taking her out of Troy Lynn's house,

19   driving to Rapid City, from Rapid City driving to Rosebud,

20   and from Rosebud up to the Badlands where she was killed.

21   That's what you told him in summary, right?

22   A.   Right.

23   Q.   And when he got done with that, near the end of that

24   questioning were you asked this question and did you give

25   this answer?

1           MR. MANDEL:  Page, counsel.

2           THE COURT:  Well, we are going to go into recess

3     for the evening.  And remember I told you don't talk to

4     each other about the case.  Don't do research on the case;

5     don't read papers or listen to the news.  Leave your notes

6     here.  Nobody is going to look at them.  Keep an open mind

7     until all the evidence is in and I give you final

8     instructions on the case and only then should you go back

9     in the jury room, then you will talk to each other about

10    the case.  Then you will decide the case, not before.

11    Thank you.  We will be in recess until 9 o'clock tomorrow

12    morning.

13           (Court adjourned 5:10 p.m.)

14           (April 16, 2010.)

15           THE COURT:  Bring in the jury please.

16           (Following proceedings in the presence of the

17    jury.)

18           THE COURT:  Please be seated.  Good morning.  I

19    am very sorry that we wound up keeping you back in the jury

20    room, but something came up this morning that court had to

21    deal with on the case.  We had to take that time before we

22    could start proceeding with more evidence this morning.

23           Go ahead.  Call Mr. Looking cloud back to the

24    stand.  He's there.  All right.  You may continue with your

25    cross-examination.

```
 1              MR. HANNA:  Thank you, Your Honor.
 2    Q.  (BY MR. HANNA)   Mr. Looking Cloud, I am going to hand
 3    you a copy of what's been marked Exhibit 232 for
 4    identification?
 5              MR. HANNA:  May I approach the witness, Your
 6    Honor?
 7              THE COURT:  You may.
 8    Q.  I'll ask you to take a look at this and tell me if you
 9    recognize it.
10              (Witness reading document.)
11    Q.  Do you recognize that document, sir?
12    A.  Yes.
13    Q.  Isn't that a copy of a motion to set aside your
14    conviction for murder?
15    A.  It's a motion under 25 USC 2255.
16    Q.  It's signed by you, isn't it?
17    A.  Yes.
18    Q.  Thank you.
19              MR. HANNA:  Your Honor, I would offer 232 into
20    evidence.
21              MR. MANDEL:  Your Honor, I object to it as being
22    a collateral document that would be inappropriate to accept
23    into evidence.
24              THE COURT:  Let me see it.
25    A.  It was denied.
```

```
 1              THE COURT:  Beg your pardon?

 2    A.   I believe it was denied, I think.

 3              MR. HANNA:  Move strike his answer as not

 4    responsive to any question.

 5              THE COURT:  There's no outstanding question at

 6    the time so that will be stricken.  There's no question

 7    pending.  I will take this under advisement.

 8    Q.   (BY MR. HANNA)  You do recall now that you signed a

 9    document asking the Court to set aside your conviction on

10    the grounds of ineffective assistance of counsel and

11    governmental misconduct, correct?

12    A.   Rephrase the question, please.  May I look at the

13    document again, please?

14              (Court handing the witness the document.)

15    Q.   You recall now, don't you, that you filed a motion to

16    set aside your conviction and sentence on the grounds of

17    ineffective assistance of counsel and governmental

18    misconduct, didn't you?

19    A.   Yes.

20    Q.   And the in fact you signed that, didn't you?

21    A.   Yes.

22    Q.   It was something you prepared in prison with the help

23    of some paralegal or someone in prison, right?

24    A.   Myself.

25    Q.   You did it yourself.  Are you something of a jail
```

1    house lawyer, too?

2    A.   No.

3    Q.   You are familiar with legal matters as a result of

4    your various experiences with the criminal justice system,

5    is that correct?

6    A.   Yes.

7    Q.   And you are aware that that case is still pending,

8    isn't it?  That motion is still pending?

9    A.   I believe it's out there somewhere.

10   Q.   Okay.  Now, since you first spoke to federal

11   authorities about this matter on August -- since you spoke

12   to federal authorities about what you say happened in 1975,

13   on August 19, 2008, you have always been accompanied by

14   your attorney, Barry Bachrach, of Boston, Massachusetts,

15   whenever you spoke to Mr. Mandel or anyone from the

16   government, isn't that true?

17   A.   Yes.

18   Q.   Okay.  Now, if you recall yesterday afternoon just

19   before we broke I was asking you questions.  I was starting

20   to ask you questions about statements you had made to

21   Detective Abe Alonzo of the Denver Police Department and

22   United States Marshal Robert Ecoffey of South Dakota on the

23   day that you were arrested on March 27, 2003.  On that --

24   after you got arrested you were asked questions and

25   answers, weren't you?

1    A.   Yes.

2    Q.   And were you asked these questions and did you give

3    these answers to Detective Alonzo and specifically to

4    Robert Ecoffey on the day you were arrested in 2003 by

5    Marshal Ecoffey. "Question.  Okay.  Well, let me see.

6    Well, let me -- since Arlo, I know for a fact that on your

7    way from Rapid City you made another stop and that you

8    stopped at you stopped in Allen, South Dakota; and that you

9    stopped at Dick Marshall and Cleo Marshall's house.  Do you

10   remember stopping there?"

11        Your answer was, "No."  Were you asked that

12   question and did you give that answer?

13   A.   Yes.

14   Q.   Were you asked this question and did you give this

15   answer?  "Okay.  You don't remember stopping there?"

16        Your answer.  "No."  Were you asked that question

17   and did you give that answer at that time?

18   A.   Yes.

19   Q.   Were you then asked this question and did you then

20   give this answer?  "And I know -- I know for a fact that

21   you stopped there because Dick and Cleo -- because both

22   Dick and Cleo are telling me that you John Boy and Theda

23   stopped there and that you had Anna Mae and somebody had a

24   note.  And that you went in, you went into their house.

25   You knocked on the door.  They answered the door.  You went

JUDITH M. THOMPSON
(605) 348-8610    FAX  (605) 343-6842

1   into the house and that point in time Theda said, 'Hey, we

2   brought some baggage we got to take there.'  And at that

3   time she had a note from someone.  That you John Boy and

4   her went into the bedroom with Dick Marshall and Cleo

5   stayed.  Cleo stayed sitting on the couch with Anna Mae and

6   you guys went in there.  You had a conversation about this

7   note.  You wanted to leave -- you wanted to leave Anna Mae

8   there.  But Dick and Cleo said, no, that you couldn't leave

9   her there.  Do you remember that happening?"

10          What is -- your answer was -- your answer then,

11   "No, I don't remember that part.  I don't know."  Were you

12   asked that question and did you give that answer?

13   A.   Yes.

14   Q.   Were you then asked this question and did you give

15   this answer?  Question by Ecoffey.  "Do you know a Dick

16   Marshall?"

17          "Answer:  I -- yeah, I met him."  Were you asked

18   that question and did you give that answer?

19   A.   Yes.

20   Q.   Were you asked this question and did you give this

21   answer?  "Question:  You met Dick.  How about his wife,

22   Cleo?"

23          Your answer, "Yeah, but not -- maybe once."  Were

24   you asked that question and did you give that answer?

25   A.   Yes.

1    Q.   Were you asked this question and did you give this

2    answer?  Question by Ecoffey.  "Do you remember stopping at

3    their house?"

4         Your answer, "No."  Were you asked that question

5    and did you give that answer?

6    A.   Yes.

7    Q.   Were you asked this question and did you give this

8    answer?  "Question:  Do you remember going into the bedroom

9    with them and Theda having a conversation with Dick about

10   keeping her there?"

11        Your answer, "No."  Were you asked that question

12   and did you give that answer?

13   A.   Yes.

14   Q.   Did he then ask you, "She had a note from someone?"

15        Your answer was, "Huh-Uh."  Was that your answer

16   to Mr. Ecoffey on 2003?

17   A.   That's correct.

18   Q.   Were you then asked this question by Marshal Ecoffey

19   and did you then give this answer?  "Question:  I want you

20   to think about this real hard, Arlo, because this is what

21   they are telling me.  This is coming from Cleo.  She said

22   she sat out there.  She said you fed -- she fed you guys.

23   She said she gave Anna Mae a change of clothes.  She said

24   you went in.  She says you -- you, John Boy, Theda, and

25   Dick went into the bedroom and had a conversation, and then

1   Dick came out and told her she said they want to keep --

2   they want to keep her here; they want us to keep her here.

3   They had a note from somebody.  They wanted her to take

4   care of this baggage.  Cleo said, 'No, we got kids here.

5   We are not going to get involved.'  So then Dick went back

6   into the bedroom, you guys came out, and she fed Anna Mae

7   some soup and she changed clothes.  You guys came out.

8   Then you took her and you left again.  Do you remember

9   stopping there?"

10          Your answer, "No.  I don't remember."  Were you

11  asked that question and did you then give that answer?

12  A.   Yes.

13  Q.   Did you then respond to this statement by Ecoffey in

14  this manner?  Question by Ecoffey.  "You need -- I need you

15  to be -- I need you to be truthful, Arlo."

16          Your answer was, "I don't remember right now.  I

17  don't remember that.  I thought we just went straight to

18  Rosebud."  Is that what you told Ecoffey on the day you

19  were arrested in 2003?

20  A.   Yes.

21  Q.   Your testimony to the jury is Theda Clarke over at

22  Troy Lynn Yellow Wood's residence just asked you if you

23  would drive them to Denver and turn around and come back,

24  right?  Just drive?

25  A.   That's correct.

1    Q.   You knew that Theda wanted you to drive because

2    somebody suspected Anna Mae Aquash of being an informant

3    for the government, correct?

4    A.   Correct.

5    Q.   So it wasn't just drive, it was take an informer, a

6    suspected informer to Rapid City so she could be

7    questioned, right?

8    A.   Right.

9    Q.   There was certainly no talk, at least at that time

10   about:  we are going to take her to South Dakota and kill

11   her, was there?

12   A.   There was no mention of any killing.

13   Q.   Okay.  But you did know that the woman you were taking

14   to Rapid City was being taken there against her will,

15   didn't you?

16   A.   Yes.

17   Q.   Because somebody in Rapid City wanted to question her

18   about whether or not she was an informant, correct?

19   A.   Correct.

20   Q.   And you were there to guard her and keep her

21   controlled, right?

22   A.   No.

23   Q.   When you were at that house, empty apartment in Rapid

24   City, you were told not to let anybody come in or come out

25   of that apartment, right?

1    A.    No.

2    Q.    No.  Okay.  You weren't there to help guard her or

3    control her in any way?

4    A.    No.

5    Q.    What about when were you outside of that house with

6    Theda Clarke, and John Boy Graham went in, you knew you

7    were there to keep her from escaping, didn't you?

8    A.    I was asleep.

9    Q.    You were asleep when Theda Clarke and John Boy Graham

10   went into a house while you and Anna Mae Aquash were

11   outside?

12   A.    I'm sorry, rephrase that question.  Is this in Rapid

13   City or?

14   Q.    No, sir.  I am talking about sometime after you left

15   Rapid City and you parked outside of a house that you think

16   was near a hospital you say you stood outside the car, Anna

17   Mae was inside the car, Theda Clarke and John Boy went into

18   a house.  That's what I am talking about.

19   A.    Right.

20   Q.    So my question is:  when they went into that house and

21   you were outside, you say outside the car, you knew that

22   your job was to make sure she did not run away, right, or

23   escape?

24   A.    Yes.

25   Q.    You knew that, right?

1    A.   I didn't know it, but she told me to stand right in

2    back of the car.

3    Q.   And every other time you've spoken about this prior to

4    2008, you have told police that you were actually in the

5    car with her, right?

6    A.   No.

7    Q.   You didn't say that to Ecoffey in 2003 when you were

8    arrested?

9    A.   No.

10   Q.   You didn't tell John Trudell that you were in the car

11   with her?

12   A.   No.

13   Q.   You did not tell John Trudell in 1988 that she was

14   begging you to let her go?

15   A.   No.

16   Q.   In fact, was she begging to you let her go?

17   A.   No, sir.

18   Q.   Was she saying, "Arlo, they are inside there deciding

19   my fate?"

20   A.   No.

21   Q.   Did she say, "They are probably going to have you do

22   the killing?"

23   A.   No.

24   Q.   Didn't she say, "Just let me go?"

25   A.   No, sir; never had a conversation with her.

1    Q.   You never had a conversation with her?

2    A.   No, sir.

3    Q.   At any time did you?

4    A.   At no time did I ever have a conversation with Ms.

5    Pictou.

6    Q.   In fact, you never heard her say anything, did you?

7    A.   I have never heard her saying anything.

8    Q.   Okay.  So from the first time you saw her was at Troy

9    Lynn Yellow Wood's residence on Pecos Street and you saw

10   her being tied up, right?

11   A.   Yes, I did.

12   Q.   And any time while she was being tied up or any other

13   time while you were in her presence at Troy Lynn's house,

14   did that lady say anything at all?

15   A.   No.

16   Q.   She was absolutely silent while she was being

17   kidnapped, is that right?

18   A.   That's right.

19   Q.   And after she was taken, tied up, and put in the back

20   of a hatch back, in the back of a Pinto automobile and

21   driven from Denver, Colorado, to Rapid City, South Dakota,

22   she never said a single word on that journey, is that your

23   testimony?

24   A.   That's correct.

25   Q.   So it takes about six hours, more or less, doesn't it,

1    to drive from Denver to Rapid City?

2    A.   Eight or nine.

3    Q.   Eight or nine.  During that eight or nine hours that

4    kidnap victim in the back of your car never uttered a word,

5    is that correct?

6    A.   That's correct.

7    Q.   And when you were at that house or that apartment in

8    Rapid City, South Dakota, for at least one night, at least

9    one day, she never spoke a word that you heard her say, is

10   that right?

11   A.   Not to me, sir.

12   Q.   Not to you or not to anybody, correct?  You never

13   heard her say anything to anybody, is that your testimony?

14   A.   She have might have spoke to John Boy because they

15   were in the room together.

16   Q.   But while you were in Rapid City you never heard Anna

17   Mae Aquash utter a single word, is that your testimony?

18   A.   Not that I know; not that I recall.

19   Q.   By the time you kidnapped her in Denver and drove her

20   to Rapid City, not once did she ever say, "What's going to

21   happen?  Why are you doing this?  I am not the person, I am

22   innocent."  She never said anything like that at any time

23   from Denver to the time you all left Rapid City, is that

24   right?

25   A.   That's right.

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1   Q.   She was totally silent, in your presence, anyway?

2   A.   Exactly.

3   Q.   And after you left Rapid City -- after you left Rapid

4   City at any time between the time you left Rapid City and

5   the time someone shot her in the head in a field in the

6   Badlands did you ever hear Anna Mae Aquash utter a word?

7   A.   I heard her -- sounded like she was praying in her

8   language; that was the last -- that was the only time.

9   Q.   She was up there on that hill and she was praying

10  Micmac, is that right?  Prying in what sounded like Indian

11  language you did not understand, right?

12  A.   Yes.

13  Q.   But between the time you took her from Rapid City to

14  the time somebody shot her up in the Badlands, you never

15  heard that woman utter a word or a sentence in the English

16  language, is that your testimony?

17  A.   That's correct.

18  Q.   She went -- she was kidnapped, driven across three

19  states, and went to her death without uttering a word, is

20  that right?

21  A.   Not to me, sir.

22  Q.   Not in your presence, is that what your testimony?

23  A.   Not in my presence.

24       MR. HANNA:  Judge, we have marked -- we offer

25  into evidence Exhibit 201 which is a videotape of an

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

 1    interview of Fritz Arlo Looking Cloud on the day he was

 2    arrested March 27, 2003.

 3            THE COURT:  Any objection?

 4            MR. MANDEL:  No, Your Honor.

 5            THE COURT:  Exhibit is received.

 6            MR. HANNA:  Your Honor, I have provided the clerk

 7    with government's transcript of this.  May I have

 8    permission to hand it out to the jury?

 9            THE COURT:  Just a moment, because there's an

10    instruction I have to give before the transcript is given

11    to the jury.

12            I told you will that I would give you some

13    instructions during the course of the trial, which I have

14    already done, and this is another one.  As you heard,

15    there's an accurate transcript of a recording that you are

16    about to hear.  The transcript undertakes to identify the

17    speakers engaged in the conversation.  You are permitted to

18    have the transcript for the limited purpose of helping you

19    follow the conversation and listen to the tape-recording

20    and also to help you keep track and speakers.  Differences

21    in meaning between what you hear in the recording and read

22    in the transcript may be caused by such things as

23    inflection of a speaker's voice.  It is what you hear,

24    however, not what you read that is the evidence.  You are

25    specifically instructed that whether the transcript

 1   correctly or incorrectly reflects the conversation or the

 2   identity of the speaker is entirely for you to decide based

 3   upon what you heard here about the preparation of the

 4   transcript and upon your own examination of the transcript

 5   in relation to what you hear on the tape-recording.  If you

 6   decide the transcript is any respect is incorrect or

 7   unreliable, disregard it to that extent.  All right.  You

 8   may give copies out.

 9            MR. HANNA:  I should probably advise the Court

10   there is a scroll transcript on the video itself.

11            THE COURT:  I want Mr. Looking Cloud to have a

12   copy also.

13            (Exhibit 201 is playing.)

14   Q.   (BY MR. HANNA)   Mr. Looking Cloud, that video we just

15   saw was an exhibit that was played in your trial, wasn't

16   it?

17   A.   Yes.

18   Q.   And after you were convicted, you got a transcript as

19   part of the record in your case that you have read between

20   your trial and now, haven't you?

21   A.   Yes.

22   Q.   And you heard Robert Ecoffey telling you, "We know for

23   a fact that you stopped in Allen," and went through various

24   details.  You also heard him say that in your video, right?

25   A.   Right.

1    Q.   And you also heard him say that Richard Marshall -- he

2    knew that because Richard Marshall and Cleo Marshall had

3    told him that.  You heard him say that on that video?

4    A.   Yes.

5    Q.   So you thought Richard Marshall had been talking about

6    you to federal authorities, right?

7    A.   Yes.

8    Q.   In street jargon you thought that Dick Marshall had

9    ratted you out, correct?

10   A.   No; I don't know.

11   Q.   You heard Ecoffey telling you Richard Marshall and

12   Cleo Marshall told me these things happened.  You heard him

13   say that, right?

14   A.   Right.

15   Q.   So do you know whether he was telling you the truth or

16   not?

17   A.   Who was telling me the truth?

18   Q.   Ecoffey when he told you Dick Marshall and Cleo

19   Marshall are both telling me you stopped at the house,

20   there was a note, you all asked if --

21   A.   If I knew the truth.

22   Q.   Do you know now whether or not Ecoffey was telling you

23   the truth about Richard Marshall saying those things?

24   A.   Yes.

25   Q.   He wasn't, was he?

1   A.   He was telling the truth, yes.

2   Q.   You believe that to this day, right?

3   A.   Yes.

4   Q.   And of course, you had -- you believed you got

5   immunity for cooperating with the government back in 1994

6   on this case, didn't you?

7   A.   To a certain extent I believe.

8   Q.   In any case, did you believe that you were being

9   arrested because Dick Marshall and Cleo Marshall had given

10  information about you stopping up at their house with Anna

11  Mae Aquash?

12  A.   No.

13  Q.   Was that part of your reason for naming Dick Marshall

14  as the guy who provided the murder weapon for the first

15  time in August 19, 2008?

16  A.   I believe that came from perjured testimony from Mr.

17  Richard Two Elk.

18  Q.   That wasn't the question I asked.  The question I

19  asked was:  when you accused Dick Marshall of giving a gun

20  to Theda Clarke when you spoke to South Dakota law

21  enforcement officials four years into your federal prison

22  sentence, when you did that, you believed that Dick

23  Marshall had ratted you out to the federal authorities?

24  A.   No.

25  Q.   You didn't like it when you thought about Richard

1  Marshall telling federal authorities that you had stopped

2  off at his house with Anna Mae Aquash in 1975 and that you

3  had asked them to keep her there; you didn't like knowing

4  that, did you?

5  A.    No.

6  Q.    You know Troy Lynn Yellow Wood, right?

7  A.    Yes.

8  Q.    One time at least, you and Troy Lynn Yellow Wood were

9  close friends, isn't that true?

10  A.    That's true.

11  Q.    And Troy Lynn Yellow Wood visited you when you were a

12  prisoner here on trial in your trial 2004, didn't she --

13  A.    That's true.

14  Q.    -- in jail over at Pennington County Jail, right?

15  A.    That's right.

16  Q.    And she visited you -- when she visited you she was

17  with her -- with your aunt Martha Featherman, true?

18  A.    True.

19  Q.    You are very close to your aunt Martha, aren't you,

20  Mr. Looking Cloud?

21  A.    Yes.

22  Q.    You would never lie to her, would you?

23  A.    Yes.

24  Q.    Yes you would or no you wouldn't lie to her?

25  A.    I would not lie to her.

1    Q.   You would not lie to your aunt Martha Featherman.

2    Isn't she a sister to one of your parents?

3    A.   My father.

4    Q.   Okay.  She is the closest thing you have to a mother

5    in life, right?

6    A.   Yes.

7    Q.   And when you were visiting with Troy Lynn Yellow Wood

8    and your aunt Martha Featherman in the Pennington County

9    Jail in 2004, didn't Troy Lynn ask you, "What is Cleo Gates

10   doing over around the courthouse at your trial?"

11   A.   I don't recall.

12   Q.   Didn't you say to your aunt Martha Featherman and Troy

13   Lynn, "They are trying to say we stopped in Allen, but I

14   don't remember anything about that?"

15   A.   I don't recall.

16   Q.   You don't recall whether you said that to Troy Lynn or

17   not?

18   A.   I don't recall.

19   Q.   Now, when you left Denver, you believed your job was

20   to take her, Anna Mae, that is, to Rapid City and drop her

21   off someplace, turn around and come back, correct?

22   A.   That's correct.

23   Q.   And when you got to Rapid City and she was taken to an

24   empty apartment, you thought your mission was accomplished,

25   right?

```
 1    A.    That's right.

 2    Q.    You thought you were done?

 3    A.    That's right.

 4    Q.    So you were done with what you signed on to do,

 5    correct?

 6    A.    Correct.

 7    Q.    And it was then time to relax and party a little bit,

 8    right?

 9    A.    That's correct.

10    Q.    And you went over to Tony Red Cloud, your friend's

11    house, right?

12    A.    Yes.

13    Q.    And you relaxed and partied a little bit with Tony,

14    right?

15    A.    No.

16    Q.    You drank with Tony, didn't you?

17    A.    No.

18    Q.    In fact, you stayed out all night with Theda's car

19    while you got drunk with Tony Red Cloud, isn't that true?

20    A.    No.

21    Q.    That's why she was mad when you came back the next

22    day, right?

23    A.    No.

24    Q.    You are saying to the jury she was mad because it took

25    you half-hour to go gas up and come back and that's why she
```

1    was mad at you?

2    A.    Yes.

3    Q.    You have a cousin name Lucy Bull Bear, don't you?

4    A.    Yes.

5    Q.    You are close to her, too, aren't you?

6    A.    Yes.

7    Q.    You'd never lie to her, would you?

8    A.    That's correct.

9    Q.    Now, Lucy Bull Bear visited you at the Pennington

10   County Jail in 2004 when you were on trial, correct?

11   A.    Correct.

12   Q.    When she did, she was with a person named Janis

13   Schmidt, isn't that true?

14   A.    That's true.

15   Q.    Janis Schmidt is a non-Indian lady, white lady, who

16   was a writer for a newspaper, a local newspaper, on Pine

17   Ridge, correct?

18   A.    I believe she was a writer, but I don't --.

19   Q.    And you spoke to her and Lucy Bull Bear and didn't you

20   tell Janis Schmidt and Lucy Bull Bear that you had no

21   recollection of stopping off in Allen because you were

22   drunk?

23   A.    No.

24   Q.    Didn't you tell Janis Schmidt and Lucy Bull Bear that

25   when you got to Rapid City and dropped off Anna Mae Aquash

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    you thought it was all done and your job was over.  You

2    told them that, didn't you?

3    A.    I don't recall.

4    Q.    Didn't you tell Janis Schmidt and Lucy Bull Bear that

5    after you dropped off Anna Mae someplace, you went over --

6    you thought the whole thing was done, and you went over to

7    your friend Tony Red Cloud's and you and he got drunk that

8    night?

9    A.    No.

10   Q.    Didn't you tell them you stayed out all night?

11   A.    No.

12   Q.    And that when you came back the next day, Theda was

13   furious?

14   A.    No.

15   Q.    And that when you left Rapid City you were still

16   intoxicated?

17   A.    No.

18   Q.    And that's why you had no recollection of anything

19   that might have happened at the Allen house of Richard and

20   Cleo Marshall; isn't that what you told them in jail?

21   A.    No.

22   Q.    Now, it is true that when you were 22 years old back

23   in 1975, you had a very serious drinking habit, didn't you?

24   Let me put it this way:  you drank a lot, didn't you?

25   A.    Yes.

1    Q.   And when you went over to Troy Lynn Yellow Wood's that

2    day, you had been drunk for days, isn't that true?

3    A.   I was drunk the night before.

4    Q.   You had been drinking for days, though, hadn't you?

5    A.   No.

6    Q.   You remember the first time you spoke to law

7    enforcement officers in Denver in 1994, November 17, 1994,

8    at the United States Attorney's office in Denver?

9    A.   Yes.

10    Q.   And were you asked this question and did you give this

11    answer at the very early part of your interview.  Robert

12    Ecoffey asked you at page 1859 of discovery.  "First, tell

13    us in your own words and after you get done telling us the

14    story, if we have any questions, or anything, we will go

15    ahead and ask you questions for any clarification.  Okay?

16    So if you want, Arlo, if you just want to just go ahead and

17    start how you -- how you first -- who contacted you and

18    when."

19          And the first thing you said was, "Nobody

20    contacted me.  I was drinking for a few days there.  I went

21    up to see -- I went up to Pecos to Troy Lynn's house

22    because I knew a guy, Joe Morgan.  Want to go party, or

23    something, go drink some more, or something."  Isn't that

24    what you said when you were interviewed the first time by

25    law enforcement in 1994?

1    A.   I don't recall, but I do recall going over there

2    drinking.

3    Q.   You wanted to -- and when you drank, you didn't drink

4    to relax, you drank to get drunk, right?

5    A.   Yes.

6    Q.   So that was your goal when you went over to Troy

7    Lynn's house?

8    A.   Yes.

9    Q.   Now, back in those days you drank about every day,

10   right?

11   A.   Yes.

12   Q.   And when you got involved in this kidnapping, you

13   continued to drink, didn't you?

14   A.   No.

15   Q.   Is it your testimony to the jury from the time you

16   left Denver until the time Anna Mae Aquash was killed you

17   never had a single drink of alcohol of any kind?

18   A.   That's correct.

19   Q.   So despite the fact you had serious alcohol problems

20   when you were involved in something that put you under a

21   whole lot of pressure you suddenly went cold turkey and

22   stopped drinking alcohol, is that right?

23   A.   That's right.

24   Q.   Even when you thought the whole thing was done and you

25   wanted to go relax and party a little bit in Rapid City,

1    you didn't have any drinks at all, is that right?

2    A.   That's correct.

3    Q.   Now, you have acquired a taste for other drugs other

4    than alcohol, haven't you.  You have acquired a taste and

5    frequently used and abused illegal drugs, haven't you?

6    A.   Yes.

7    Q.   Heroin being your favorite, is that correct?

8    A.   No.

9    Q.   What was your favorite drug of choice of 1975 until

10   the time you were arrested in 2003?

11   A.   Mescaline.

12   Q.   Mescaline, a mind-altering hallucinogenic drug similar

13   to LSD, correct?

14   A.   Correct.

15   Q.   You also liked to do LSD, too, didn't you?

16   A.   Yes.

17   Q.   And you also did a lot of methamphetamine, too,

18   correct?

19   A.   Yes.

20   Q.   And you have done a lot of heroin, too, haven't you?

21   A.   On occasion.

22   Q.   And while you're consuming these drugs, you never gave

23   up your abuse of alcohol either, did you?

24   A.   No.

25   Q.   So you liked to do drugs like mescaline,

1    methamphetamine, heroin, in conjunction with alcohol, true?

2    A.   That's true.

3    Q.   Now, do these drugs, including alcohol, do they help

4    your memory, help you remember things, or do they impair

5    your memory and your ability to remember things, in your

6    judgment?

7    A.   I was -- there was no memory.

8    Q.   There was no memory?

9    A.   It was a trip.

10   Q.   It was a trip?  I'm sorry, could you repeat your

11   answer?  My question to you, sir, is:  do you think all

12   these drugs and alcohol helped you remember things later on

13   or did they impair, did they hurt your ability to remember

14   things later on?

15   A.   I remember a lot of things.

16   Q.   But you've woken up in jail without having any memory

17   of how you got there, haven't you?

18   A.   No.

19   Q.   Have you ever had an alcohol blackout?

20   A.   Yes.

21   Q.   Okay.  You just wake up you don't know what happened

22   the night before, right?

23   A.   Right.

24   Q.   And it's also true, isn't it, that many, probably if

25   not every time you got arrested, most of the time you got

```
 1    arrested you were drunk or under the influence of drugs or
 2    both at the time you did whatever you did to get arrested,
 3    right?
 4    A.   Right.
 5    Q.   But this time when you do a kidnapping that results in
 6    a murder, you didn't touch a drop of alcohol, is that
 7    right?
 8    A.   That's right.
 9    Q.   You didn't do any drugs, smoke any marijuana, do any
10    LSD, or anything like that, right?
11    A.   That's right.
12    Q.   You wanted a clear head for this kidnapping, is that
13    right?
14    A.   Whenever I was with Theda, I never touched no alcohol.
15    Q.   Theda drank too, didn't she?
16    A.   I wouldn't know.
17    Q.   You don't know?
18    A.   No.
19    Q.   You were with Theda a lot, weren't you?
20    A.   Yes.
21    Q.   She owned a bar, didn't she?
22    A.   Yes.
23    Q.   You hung out at that bar, didn't you, in Keenesburg?
24    A.   On occasion I visit.
25    Q.   Okay.  Now, that video we just saw, that was the first
```

1    time -- well, let me start again.  That video that we just

2    saw, other than the time when Abe Alonzo and Mr. Ecoffey

3    and Ianucci took you from Colorado in custody out to the

4    place where Anna Mae Aquash was killed, other than that one

5    time, that video, your statement to the police there, is

6    the only time you have talked to police or law enforcement

7    about Anna Mae Aquash without having a lawyer sitting next

8    to you, right?

9    A.   Right.

10   Q.   Now, actually as we just saw in the video, you did

11   tell Ecoffey that you were sitting in the car with Anna Mae

12   Aquash outside that house in Rosebud with Theda and John

13   Boy went in the house.  That's what you told them on March

14   27, 2003, correct?

15   A.   I don't recall.

16   Q.   You sat here and 15 minutes ago you watched a video,

17   didn't you?  My question to you is:  that's what was on the

18   video; you say to Ecoffey, "I sat in the car with Anna Mae

19   outside that house in Rosebud."

20   A.   Well, when she walked in, John Boy and I stayed out in

21   the car and then when she come back out and got John Boy,

22   when they both went in, she told me to stand outside.

23   Q.   That isn't what you said in 2003, was it?

24   A.   Well, I probably never went in with Ecoffey because I

25   never trusted Ecoffey or Abe Alonzo.

1   Q.   Have you told people that Abe Alonzo gave you heroin

2   and alcohol?

3   A.   He -- Abe Alonzo has on many occasions given me money.

4         COURT REPORTER:  Don't get so close to the

5   microphone and please restate your answer.

6   Q.   I didn't ask you that.  Has he ever given you heroin?

7   A.   No, he's never give me no heroin.

8   Q.   Ever given you alcohol?

9   A.   No.

10  Q.   Haven't you told people that:  Abe Alonzo gave me

11  alcohol and drugs?

12  A.   What other people have written -- I don't know what

13  other people have written; there's a lot of things that

14  people of wrote which I have never said.

15  Q.   I am asking you:  did you tell somebody?

16  A.   No, I didn't.  No, I did not.

17  Q.   Now, my question to you was -- I am not asking you

18  what happened outside that house in Rosebud.  I am asking

19  you:  didn't you tell Alonzo on the day you were arrested

20  that you were sitting in the car with Anna Mae Aquash?

21  A.   No.

22  Q.   You didn't?  Okay.  Was that somebody else we just

23  saw on that video or was that you?

24  A.   That was I.

25  Q.   Now, when you were arrested on March 27, 2003, you

1    didn't mention the name Charlie Abourezk, did you?

2    A.   No.

3    Q.   Is that because you were afraid of Charlie Abourezk in

4    2003?

5    A.   Yes.

6    Q.   Charlie Abourezk, attorney at law in Rapid City, South

7    Dakota; that's the guy you were afraid of in 2003, is that

8    right?

9    A.   That's right; that's correct.

10   Q.   You were afraid -- and you were sitting there

11   thinking:  I don't want to say anything about Charlie

12   Abourezk because he can hurt me or do something to me, is

13   that right?

14   A.   That's right.

15   Q.   And you were thinking about that in 2003 when they

16   were asking you questions, is that right?

17   A.   That's correct.

18   Q.   Charlie Abourezk, son of a United States Senator from

19   the State of South Dakota, that's the Charlie Abourezk we

20   are talking about, right?

21   A.   That's correct.

22   Q.   What did you think Charlie Abourezk was going to do to

23   you?

24   A.   He's well-connected with all the AIM leadership and,

25   of course, a lot of members.

1  Q.   In 2003 this was going through your head, is that

2  right, when you were talking to these guys?

3  A.   I knew.

4  Q.   Sometimes Anna Mae Aquash was tied up and sometimes

5  she wasn't, isn't that right?

6  A.   That's right.

7  Q.   You guys took -- untied her sometime after she left

8  Denver, didn't you, when you were driving her to Rapid City

9  or was she tied up the entire eight hours?

10 A.   I do not recall.

11 Q.   She wasn't tied up when you brought her into the

12 Marshall house, was she?

13 A.   I do not recall.

14 Q.   You are not telling the jury she was tied up when you

15 all brought her to the Marshall house, are you?

16 A.   I don't recall.

17 Q.   You know a significant part of this trial is about

18 what you can and cannot recall, right?  Your memory is at

19 issue here.  You understand that, right?

20 A.   Right.

21 Q.   Now, in 2003 when you spoke to Ecoffey, you could not

22 recall the caliber of the gun that was used to kill Anna

23 Mae Aquash, right?

24 A.   That's right.

25 Q.   You told him you didn't know what caliber gun killed

1    Anna Mae Aquash, right?

2    A.    Correct.

3    Q.    In 1994 you remembered though, didn't you, when you --

4    A.    Yes.

5    Q.    You knew in 1994 when you talked to Ecoffey for the

6    first time that that was a .32 caliber pistol that murdered

7    Anna Mae Aquash, right?

8    A.    Yes.

9    Q.    You forgot that sometime between 1994 and the time

10   that you were talking to Ecoffey in 2003, is that right?

11   A.    I did not forget.

12   Q.    You just lied to him when he asked you, "Do you know

13   what kind of caliber gun it was?"

14   A.    I just didn't say.

15   Q.    Actually you said, "I don't know what kind of caliber

16   it was," didn't you?

17   A.    Yes.

18   Q.    And that was a lie, correct?

19   A.    Yes.

20   Q.    So you did lie to Ecoffey, right?

21   A.    Yes.

22   Q.    Okay.  And in fact in the course of your experiences

23   in criminal justice system you have frequently lied to law

24   enforcement officers, haven't you?

25   A.    Yes.

1    Q.   You feel, don't you, that the government and its

2    agents are lawyers lied to you when you got charged with

3    the murder of Anna Mae Aquash, right?

4    A.   My case has always and I feel that it was mishandled.

5    Q.   Okay.  You are -- after you were convicted here in

6    this courtroom in 2004, on October 19, 2004, you were

7    called by the United States Government to testify in a

8    grand jury here in Rapid City, right?

9    A.   That's correct.

10   Q.   And Mr. Mandel asked you questions at that time,

11   right?

12   A.   Right.

13   Q.   And you told Mr. Mandel and the grand jury you were

14   innocent, right?

15   A.   That's correct.

16   Q.   And you told them that you had been granted immunity

17   since 1994, you don't know what happened.  In 1994 all we

18   wanted you as was a witness.  In '94 they gave you a paper

19   and if you cooperated -- and you have been cooperating

20   since 1994 and you didn't know why you were convicted of

21   murder.  And you said, "The government, they don't honor

22   their own agreements," right?  That's what you said?

23   A.   That's correct.

24   Q.   You believed that, didn't you, the government did not

25   treat you fairly, right?

1    A.    That's correct.

2    Q.    They made agreements with you that they violated,

3    right?

4    A.    Yes.

5    Q.    That you thought they had given you immunity and then

6    they turn around and arrested you and convicted you for

7    murder.  You thought that was a violation of what they

8    promised you, right?

9    A.    That's correct.

10    Q.    In fact, you said something to Mr. Mandel, "I don't

11    understand the agreements that you all made with me and

12    didn't keep."  That's what you said to him in front of the

13    grand jury, right?

14    A.    I did not say that in front of the grand jury.

15    Q.    Well, everything -- well, were you asked this question

16    by Mr. Mandel and did you give this answer?  "Are you

17    willing to answer questions here today, sir?"

18           And you said, "I think I'd like a little bit of

19    time to think about this because the agreements you all

20    made with me, you guys never followed through and I

21    cooperated since 1994."  Isn't that what you said in front

22    of the grand jury.

23    A.    No.

24    Q.    That's not what you said?  Do you remember what you

25    said in front of the grand jury?

1  A.   I remember saying that I would like to speak to my

2  attorney up in Colorado, Mr. Mulvihill.

3  Q.   Were you asked this question and did you say that in

4  front of grand jury and to Mr. Mandel?  Quote, "And

5  immunity that was offered me by the FBI, now I want to know

6  what's up with that.  I don't know what the deal was with

7  that.  The FBI made a deal."

8  A.   I don't recall.

9  Q.   In any case, that is the way you felt after your

10 conviction in 2004, right?

11 A.   I believe my case was mishandled.

12 Q.   Now --

13        THE COURT:  We are going to have our noon recess

14 now.  We will be in recess until 1:00 o'clock.  Don't talk

15 to each other about the case until you have heard all the

16 evidence.

17        Please stand for the jury.

18        (Noon recess.)

19        THE COURT:  Bring in the jury, please.

20        (Following proceedings in the presence of the

21 jury.)

22        THE COURT:  You may continue.

23 Q.   (BY MR. HANNA)   Mr. Looking Cloud, it's accurate to

24 say, isn't it, that certainly after you were convicted and

25 sentenced to life in prison you felt the government had

1    unfairly used you, correct?

2    A.    Correct.

3    Q.    And so you didn't feel bad if you could use the

4    government to get out of prison, right?

5    A.    Yes.

6    Q.    And they had lied to you; you didn't feel bad if you

7    lied to them to get out of prison, right?

8    A.    No.

9    Q.    You told the jury that the government has never made

10   you any promises, is that right?

11   A.    That's correct.

12   Q.    Back in 1994, when you did your proffer session in

13   Denver, weren't you told by the FBI agent that if you said

14   that you had helped tie up Anna Mae Aquash you would not be

15   charged for that.  Did they tell you that?

16   A.    Yes.

17   Q.    Now, in fact, in 1994, after Detective Alonzo told you

18   that you might be able to get your charge of felony assault

19   on a police officer dismissed if you came in with your

20   attorney and told him what you knew about the death of Anna

21   Mae Aquash, right?

22   A.    Right.

23   Q.    And you consulted with your attorney, correct,

24   Mr. Mulvihill?

25   A.    That's correct.

1   Q.   And on November 3, 1994, you and your attorney entered

2   into an agreement with the government whereby if you gave a

3   complete -- a truthful and complete summary of all facts

4   about which you are aware concerning your knowledge of the

5   death of Anna Mae Aquash, they would consider whether or

6   not they wanted to make a deal with you whereby you would

7   be a witness against other people, correct?

8   A.   Correct.

9   Q.   They didn't promise you a deal; they didn't say, "We

10   will use you as a witness," did they, at that time?

11   A.   I don't understand.

12   Q.   Okay.  They told you that they'd think about whether

13   or not they wanted to offer you a deal for whereby you

14   would be a witness and cooperate and testify against

15   somebody; they'd think about it?

16   A.   I don't understand you.

17   Q.   All right.  You promised to tell them the truth,

18   right?

19   A.   No promises.

20   Q.   Didn't you promise to tell them the truth?

21   A.   Yes.

22   Q.   And your attorney got a letter that basically set out

23   the terms of the agreement, right?  Let me show you what

24   has been marked Defendant's Exhibit 202.

25           MR. HANNA:  May I, Your Honor?

1          THE COURT:  You may.

2    Q.   (BY MR. HANNA)   Please review that.

3    A.   Thank you.

4    Q.   You have reviewed that; you recognize that?

5    A.   Yes.

6    Q.   That's a letter that was written by the United States

7    Attorney to your attorney setting forth the terms of the

8    proffer agreement -- proffer you would make to them,

9    correct?

10   A.   That's correct.

11   Q.   Thank you.

12          MR. HANNA:  I offer Exhibit 202 into evidence.

13          MR. MANDEL:  No objection, Your Honor.

14          THE COURT:  Exhibit 202 is received.

15   Q.   (BY MR. HANNA)   And before you went into this proffer

16   session and were interviewed, you, of course, talked with

17   your attorney Henry Mulvihill of Denver, correct?

18   A.   That's correct.

19   Q.   And on November 17, 1994, when you spoke to Marshal

20   Ecoffey and others, James Graff of the FBI -- you knew that

21   in order for the government to convict you of murder they

22   would have to prove that you knew Anna Mae Aquash was going

23   to be murdered and that you intentionally helped murder

24   her, didn't you?

25   A.   No.

1    Q.    Didn't you know that mental intent is part of the

2    crime of murder at that time?

3    A.    No.

4    Q.    You know it now, don't you?

5    A.    No.

6    Q.    You don't know that after going through a trial?

7    A.    No.

8    Q.    Isn't that -- wasn't that your whole defense in your

9    trial you didn't know she was going to be murdered?

10   A.    I don't recall.

11   Q.    You don't recall that happening in your trial.  Okay.

12   In 2000 -- excuse me -- November 17, 1994, you went to the

13   office of United States Attorney in Denver with your

14   attorney, Henry Mulvihill, right?

15   A.    That's right.

16   Q.    And Special Agent Jim Graff of the FBI, Robert

17   Ecoffey, and others asked you questions and you gave

18   answers, right?

19   A.    Yes.

20   Q.    And that was recorded, wasn't it?

21   A.    I assume it was, yes.

22          MR. HANNA:  Your Honor, at this time I offer into

23   evidence tape-recordings marked 219, Exhibit 219.

24          THE COURT:  Any objection?

25          MR. MANDEL:  No, Your Honor.

1          THE COURT:  219 is received.

2          MR. HANNA:  I would ask that our legal technical

3     assistant be able to play that for the jury, Your Honor.

4     We have provided a transcript also.

5          THE COURT:  Very well.

6          Members of the jury, once again I am going to

7     remind up as I did with regard to the last transcript,

8     which this is the type of transcript of which you are about

9     to listen to, that transcript undertakes to identify the

10    speakers and engage in the conversations.  You are

11    permitted to have the transcript for a limited purpose of

12    helping follow the conversation as you listen to and watch

13    the video.  Also, to help you keep track of the speakers.

14    Differences in meaning between what you hear and see and

15    read in the transcript may be caused by such things as the

16    inflections of a speaker's voice.  It is what you hear,

17    however, not what you read that is the evidence.  You are

18    specifically instructed whether the transcript correctly or

19    incorrectly reflects the conversation or the identity of

20    the speakers is entirely for you to decide based on what

21    you have heard and seen here about the preparation of the

22    transcript, and upon your own examination of the

23    transcript, in relation to what you hear and see on the

24    video recording.  If you decide that the transcript is any

25    respect incorrect and unreliable, you should disregard it

```
 1          to that extent.  You may proceed.

 2                    (The tape, Exhibit 219, is playing.)

 3                    MR. HANNA:  Judge, can we have a break here?

 4                    THE COURT:  Beg your pardon?

 5                    MR. HANNA:  We are having a technical problem.

 6          We need to take a brief break to get it straightened out.

 7                    THE COURT:  Very well.  We will be in recess for

 8          10 minutes, hopefully.  Don't talk about the case.

 9                    (Recess taken.)

10                    THE COURT:  We all know it's not a perfect world.

11          And my understanding is that the technical person for the

12          defense has this same material on the program apparently

13          called Trial Director, which is an MP3 file, correct?

14                    MS. ANDERSON-MILLER:  Correct.

15                    THE COURT:  Does government object to playing

16          that even though the CD will be what's put in evidence?

17                    MR. MANDEL:  As long as it's the same we don't

18          object, Your Honor.

19                    THE COURT:  It's been represented to me by

20          their technical person as well as by defense counsel that

21          it's the same information, same voices, everything, is that

22          correct?

23                    MR. HANNA:  Yes.

24                    THE COURT:  Do you need a moment to make sure

25          that your Trial Director plays through this?
```

1          MS. ANDERSON-MILLER:  I would like a moment.

2          THE COURT:  Let's take a moment before we get the

3     jury in.

4          (Off the record.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. HANNA:   I respectfully ask we try this one

2      more time.  If it stops --

3           THE COURT:  Look, I have ruled.  You can't play

4      it so you will to have cross-examine from the transcript.

5           MR. HANNA:  It is in evidence.  I will seek to

6      get everything worked out and produce it for the jury

7      later.  I don't need to cross-examine the witness about it,

8      if that's all right.

9           THE COURT:  Well, yes, it is in evidence.  So you

10     can proceed and use it for cross-examination.

11          Now the court reporter needs a little bit of time

12     for technical reason, too, before we proceed.

13          THE COURT:  Bring in the jury, please.

14          (Following proceedings in the presence of the

15     jury.)

16          THE COURT:  Please be seated.  Well, it appears

17     we couldn't overcome the technical problems so we are going

18     to move on.  It's in evidence anyway, so you can go ahead.

19          MR. HANNA:  The jury should give the transcripts

20     back because they won't be needing them.

21          THE COURT:  Right.  You can gather them up.

22     Q.   (BY MR. HANNA)   Sir, sometime after you returned to

23     Denver after Anna Mae Aquash was murdered, you returned to

24     South Dakota to try to recover the gun, isn't that correct?

25     A.   Yes.

1    Q.   When did you return to South Dakota to try to recover

2    the gun, Mr. Looking Cloud?

3    A.   I don't recall, but it was sometime maybe -- I can't

4    recall.

5    Q.   Perhaps a year later, is that right?

6    A.   Maybe, yes.

7    Q.   Maybe more, maybe less, right?

8    A.   Yes.

9    Q.   Why did you come back to look for the gun to try to

10   get the gun back?

11   A.   I was staying on a little -- I lived on top of the

12   hill and the bridge was right below the village, the

13   village of Potato Creek.

14   Q.   The testimony is that you were back in South Dakota

15   for a while and while were you in South Dakota you decided

16   to try to recover the gun that had killed Anna Mae Aquash,

17   is that right?

18   A.   Yes, see if it was still there.

19   Q.   And you went back to that bridge, correct?

20   A.   That's correct.

21   Q.   That's a bridge over by Potato Creek?

22   A.   Right below the hill.

23   Q.   By Potato Creek on the Pine Ridge Reservation, right?

24   A.   That's right.

25   Q.   And you remember where that gun had been buried,

```
 1   correct?

 2   A.   Not the exact spot, no.

 3   Q.   You remembered the bridge, though, right?

 4   A.   Yes.

 5   Q.   You remembered it was buried under the bridge, right?

 6   A.   Right.

 7   Q.   And when you -- you personally helped to bury it back

 8   then in 1975, didn't you?

 9   A.   Yes.

10   Q.   And it was buried in a pillow case, wasn't it?

11   A.   Yes.

12   Q.   And of course, it was buried because you didn't want

13   it turning up as an exhibit in a trial some day, correct?

14   A.   I assume, yes.

15   Q.   You didn't want it to connect you to the crime, right?

16   A.   No.

17   Q.   You went to try to find the gun because you were

18   afraid that if the gun was recovered, it might connect you

19   will to the crime some how, right?

20   A.   No.

21   Q.   Isn't it true that after you got that back to Denver

22   you started thinking about what would happen if somebody

23   found that gun?

24   A.   No.

25   Q.   And isn't it true that when you buried that gun in the
```

1  pillow case, didn't you wipe your fingerprints off before

2  you buried it?

3  A.   John Boy and I both wiped our fingerprints and wiped

4  the gun off.

5  Q.   So before you buried the gun underneath the bridge,

6  you wiped or did your best to wipe your fingerprints off as

7  well as whatever fingerprints were on there, right?

8  A.   Yes.

9  Q.   But of course, later on you started wondering that

10  maybe there was still fingerprints on there, right?

11  A.   No.

12  Q.   Isn't that one of the reasons you went back to that

13  bridge and tried to find that gun?

14  A.   No.

15  Q.   Now, you know that guns have serial numbers on them,

16  don't you?

17  A.   Yes.

18  Q.   And you knew that back in the '70s, whenever it was,

19  that you went back to find that gun, correct?

20  A.   Correct.

21  Q.   And weren't you afraid that somebody happened to find

22  that gun with its serial number on it and with any possible

23  fingerprints that might be on it, could prove that you

24  participated in the murder?

25  A.   No.

```
1    Q.   You just wanted to get that gun for your private
2    collection or perhaps for a souvenir?
3    A.   No.
4    Q.   You wanted it because you were afraid that it could be
5    used as evidence against you, correct?
6    A.   No.
7    Q.   Why did you go try to get the gun?
8    A.   I was on top of the hill in the village.
9    Q.   So you just didn't have anything better to do that
10   day?
11   A.   Correct.
12   Q.   That was the only reason you went down to try to
13   recover the murder weapon that killed Anna Mae?
14   A.   Yes, ma'am; yes, sir.
15   Q.   When you were first -- we have established that when
16   you went to Rapid City -- from Denver to Rapid City, took
17   Anna Mae Aquash from Denver to Rapid City, your
18   understanding was you were just going drop her off here and
19   you are going back to Denver, right?
20   A.   Correct.
21        MR. MANDEL:  Your Honor, objected to as
22   cumulative.
23        THE COURT:  Sustained.
24   Q.   (BY MR. HANNA)   When you were in Rapid City and Theda
25   Clarke was angry at you and she told you, "We are going to
```

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    go someplace else now," right?

2    A.   Yes.

3    Q.   And you thought -- you had thought you were going to

4    go back to Rapid City up to that point, right?

5    A.   From Rapid City back to Rapid City?

6    Q.   Thank you.  Rapid City to Denver you thought you were

7    going to go from Rapid City to Denver, back to Denver,

8    right?

9    A.   I don't recall, no, I don't.

10   Q.   When you -- she told you in Rapid City that you were

11   going someplace else; that was not part of the plan, was

12   it, the original plan?

13   A.   I don't recall.

14   Q.   Do you recall whether you asked her why are we going

15   to drive down to someplace else other than go back to

16   Denver?

17   A.   I'm sorry, I don't recall.

18   Q.   Do you recall whether when John Boy Graham shot Anna

19   Mae Aquash whether you said, "Hey, John Boy, why did you do

20   that," or something like that?

21        MR. MANDEL:  Again, objected to as cumulative,

22   Your Honor.

23        MR. HANNA:  I didn't ask that question.

24        THE COURT:  I don't want argument between

25   counsel.  Overruled.

1   Q.   (BY MR. HANNA)   My question was:  when you saw John

2   Graham shoot Anna Mae Aquash, did you say anything to him

3   like, "John Boy, why did you shoot that woman?"

4   A.   What was your first question?  There was never know

5   question.  There was no answer.  There was no exchange, no

6   exchange of conversation of whatsoever.

7   Q.   When Mr. Mandel asked you what was your reaction when

8   you saw John Graham shoot Anna Mae Aquash, your answer was

9   words to the effect of, "I freaked out, man.  It blew my

10   mind.  I was -- it was -- I was tripping."  Remember your

11   testimony yesterday to that effect?

12   A.   If it's on paper I would like to see what you have

13   there, you know.

14   Q.   It made an impression on you, didn't it, when you saw

15   somebody suddenly shoot Anna Mae Aquash?

16   A.   Is that on paper?  Can I see it?

17        MR. HANNA:  Judge, could you direct the witness

18   to answer the question?

19        THE COURT:  Just answer the question.

20   A.   What was the question?

21   Q.   (BY MR. HANNA)   It made an impression upon you when

22   John Graham shot Anna Mae Aquash in front of you, didn't

23   it?

24   A.   What kind of impression are you referring to?

25   Q.   Did you freak out, were you tripping, did it blow your

1  mind?

2  A.   Yes, sir, it did.

3  Q.   Did it have an effect so as you asked him, "What did

4  you do that for, John?"

5  A.   If that is on paper, I'd like to see.

6        MR. HANNA:  Direct the witness to answer the

7  question, Your Honor.

8        THE COURT:  Read the question back.

9        (The pending question was read by the reporter.)

10  A.   I never said no such thing.

11  Q.   (BY MR. HANNA)   You didn't say anything at all to

12  John Boy Graham after he suddenly shot Anna Mae Aquash in

13  the head, right?

14  A.   That's right.

15  Q.   When you parked outside of a house somewhere near a

16  hospital where you previously said was Rosebud, did you say

17  to Theda Clarke, "Where you going, Theda," or words to that

18  effect when she walked into the house?

19  A.   If that's on paper I'd like to see it.

20  Q.   I am not saying you said that.  I am asking you

21  whether you said that.

22  A.   No.

23  Q.   You didn't ask her anything at all about why we are

24  here or what you are doing, is that right?

25  A.   If that's on paper, I'd like to see it.

1    Q.   My question is:  when you were driving west -- excuse

2    me -- when you were driving east into South Dakota after

3    leaving Rapid City when you stopped outside of a house in

4    Rosebud when you drove to the Marshall house and went in,

5    when you then drove up into the Badlands, at any point in

6    time did you ask Theda Clarke anything about:  what are we

7    doing; why are we doing these things; what's going on;

8    anything like that?

9    A.   No.

10   Q.   Now, weren't you afraid to be picked up by the police

11   at some point when you are driving through South Dakota?

12   A.   No.

13   Q.   You had kidnapped a woman; she was in the back of the

14   car; you weren't afraid if you got pulled over by a police

15   officer you might get arrested?

16   A.   No.

17   Q.   So you were not the least -- were you curious as to

18   what was going on at any point before Anna Mae Aquash was

19   shot out in the Badlands as to why you were there?

20   A.   No.

21   Q.   You were not curious?   Were you not curious?

22   A.   No.

23   Q.   Now, your decision to cooperate and testify against

24   others in this case was influenced by your desire to get

25   out of prison, wasn't it?

1    A.    No.

2    Q.    Isn't it true that you hoped that if you testified for

3    the government against Richard Marshall or anybody else you

4    might get out of federal prison?

5    A.    The truth.

6    Q.    My question is:  you hoped to get out of federal

7    prison --

8    A.    No.

9    Q.    You were perfectly fine, all right with being in

10   federal prison?

11   A.    No one is.

12   Q.    You wanted to get out of prison when you came here to

13   South Dakota in August of 2008, didn't you?

14   A.    Just the truth.

15   Q.    Didn't you want to get out of prison when you came

16   here in 2008?

17          MR. MANDEL:  Your Honor, I object to this again

18   as asked and answered.

19          THE COURT:  One more time after that, that's it.

20   One more time.  Question stands.  Objection is overruled.

21   Q.    (BY MR. HANNA)   When Mr. Mandel was asking you

22   questions he said you hoped to get a benefit, or words to

23   that effect, is that right?

24   A.    That's right.

25   Q.    What benefit do you expect to get -- one of the

 1    benefits you hope to get is to get out of jail and prison,

 2    isn't it?

 3    A.    The truth.

 4    Q.    That's not an answer.

 5          MR. HANNA:  I move to strike as it's not

 6    responsive to my question.

 7          THE COURT:  Denied.

 8    Q.    You are eligible for parole after 10 years of being in

 9    custody, isn't that right?

10    A.    The BOP -- the BOP has no written, nothing written

11    that I would be eligible for parole in 10 years.

12    Q.    You believe you are eligible for parole in 10 years

13    after you have done 10 years of a sentence, is that right?

14    A.    The Bureau of Prisons does not acknowledge.

15    Q.    Yes or no, please.

16    A.    No.

17    Q.    You don't believe that.  Isn't it true that you expect

18    to get out of prison before 10 years, right?

19    A.    No.

20    Q.    You are aware, aren't you, that we have subpoenaed

21    recordings of your telephone conversations from jail?

22    A.    Yes.

23    Q.    Now, you got held in jail in Sturgis and in Deadwood,

24    right?

25    A.    And Sioux Falls, the hole?

1    Q.   Isn't it true that you spoke to a lady named Johanna

2    who asked you whether or not you expect to get a benefit

3    from your cooperation and testimony; and didn't you tell

4    her that's what it's been all about since the beginning?

5    A.   I do not recall.

6    Q.   Do you recall speaking to your friend, Mindy, and she

7    asked you:  I read somewhere that you eligible for parole

8    in 10 years, is that right?

9    A.   I do not recall.

10   Q.   And you said, "That's the way it's supposed to be but

11   something has changed; I can't talk about it on the phone.

12   I will talk about it when I see you"?

13   A.   I don't recall.

14   Q.   Right now you do expect to get out of jail soon as a

15   result of your cooperation for the government here, don't

16   you?

17   A.   The truth.

18   Q.   What about the truth?

19   A.   I am only here for the truth.

20   Q.   You are also here to get out of prison, aren't you?

21   A.   If it happens.

22   Q.   You want that to happen, don't you?

23   A.   Of course.

24   Q.   In fact, it's already happened, hasn't it?  You are

25   not in prison; you haven't been in prison since August of

1    2008, have you?

2    A.   I have been in prison.  I have been in Sioux Falls

3    prison in the hole.

4    Q.   After you first gave your story to the government on

5    August 19, 2008, you have never spent a night behind the

6    walls of a federal penitentiary, have you?

7    A.   I have been inside state prison.

8    Q.   You were in prison, state prison, for a matter of

9    weeks?

10   A.   Months.

11   Q.   But most of the time you have been in jail in Meade

12   County and Lawrence County, right?

13   A.   I have spent four months in Sioux Falls State Prison.

14   Q.   Okay.  Since you --

15   A.   Five months, I think; I believe.

16   Q.   Since August 2008, the rest of the time you have been

17   housed in county jails here in South Dakota, right?

18   A.   That's correct.

19   Q.   Now, before you spoke to the government on August 19,

20   2008, you were living in the federal penitentiary in

21   Pollock, Louisiana, weren't you?

22   A.   That's correct.

23   Q.   And that is a dangerous place to live, isn't it?

24   A.   Yes.

25   Q.   And in the year preceding your agreeing to go

1    cooperate, about nine people got murdered in that prison,

2    didn't they?

3    A.   Yes.

4    Q.   People in Pollock get beat up or stabbed every week or

5    day; it's a frequent occurrence, isn't it?

6    A.   That's correct.

7    Q.   And there are an awful lot of dangerous prison gangs

8    in Pollock, aren't there?

9    A.   Yes.

10   Q.   Mexican Mafia, Arian Brotherhood, Latin Kings, Bloods,

11   Cripts, white supremacy gangs like the Arian Brotherhood,

12   right?

13   A.   That's correct.

14   Q.   Are you in a prison gang?

15   A.   No.

16   Q.   So you are all alone in there, right, in terms of

17   protection?

18   A.   Yes.

19   Q.   But you can handle it because you are not afraid, are

20   you?

21   A.   No.

22   Q.   Now, it's a lot more comfortable for you -- isn't it a

23   lot safer over in the jail in Sturgis than it is in the

24   penitentiary in Louisiana, isn't it?

25   A.   No.

```
 1   Q.   It's not safer for you -- it's not -- let me ask you
 2   this:  it's not more comfortable for you in jail here in
 3   South Dakota than it would be back in Pollock, Louisiana?
 4   A.   In some aspects it is.
 5   Q.   One aspect is your relatives and friends can visit you
 6   up here, right?
 7   A.   Yes.
 8   Q.   And they do, don't they?
 9   A.   Yes.
10   Q.   That's a whole lot better than being stranded down in
11   Louisiana without any relatives or friends to visit you,
12   isn't it?
13   A.   Yes.
14   Q.   You get to watch TV all day or whenever you want to up
15   here in South Dakota, don't you?
16   A.   Yes.
17   Q.   So you have already benefited greatly by your
18   agreement to testify and cooperate with the government,
19   haven't you?
20   A.   No, but it's all the delays.
21   Q.   It's been uncomfortable for you with all the delays?
22   A.   Not been very comfortable.
23   Q.   And the alternative would have been you would be
24   serving a life sentence in Pollock or some other
25   penitentiary?
```

1    A.   That's right.

2    Q.   Now, when you speak on the telephone in prison or from

3    South Dakota jails, that's another benefit you get from

4    living up here in county jail as opposed to Pollock:   you

5    can have phone cards and call people all the time, can't

6    you?

7    A.   I can in prison.

8    Q.   You can here in South Dakota, right?

9    A.   I can also in prison, yes.

10   Q.   Now, when you make phone calls from jail here in South

11   Dakota, every phone call begins with an announcement

12   advising you and whoever else is on the line that these

13   calls are monitored, are subject to monitoring and

14   recording, correct?

15   A.   That's correct.

16   Q.   And so you know that somebody could be listening

17   either then or some time later to your conversation, right?

18   A.   That's correct.

19   Q.   So you were somewhat careful about what you say on the

20   telephone about your case, et cetera, right?

21   A.   That's correct.

22   Q.   Sometimes you speak Lakota to other Lakota speakers

23   thinking that non-Lakota speakers will not understand what

24   you are saying, correct?

25   A.   No.

1    Q.   Haven't you actually told people in Lakota, "When I

2    speak Indian they don't know what I am saying in Lakota?"

3    A.   Yes.  Other inmates don't understand.

4    Q.   You have a friend who is a male in the Denver area and

5    he speaks to you sometimes; his phone number ends in 1080.

6    Didn't you say to that person -- first of all, let me ask

7    you this:  didn't you say to that person, "Wagleen

8    apinktay?"

9    A.   Sorry, I don't understand.

10   Q.   Does the word wagleen apinktay mean I am getting out

11   in Lakota?

12   A.   I may have, yes.

13   Q.   You may have told somebody you are getting out in

14   Lakota, right?

15   A.   Yes, I may have.

16   Q.   In fact, didn't you say to one of your friends, "It

17   looks like I am getting out pretty soon.  I may show up at

18   your door."

19        And he said to you, "We can get drunk and smoke

20   some payje."

21   A.   Is that yes or no?

22   Q.   That's what I am asking you.

23   A.   Yes.

24   Q.   Okay.

25        THE COURT:  All right.  Now, listen, this is a

                    JUDITH M. THOMPSON
            (605) 348-8610    FAX  (605) 343-6842

1    serious matter.  Lots of things are at stake there.  I

2    don't want anymore participation from the audience.  If we

3    do, I will clear the courtroom.  Proceed.

4    Q.   (BY MR. HANNA)    Payje is Lakota for grass, right, and

5    slang for marijuana, correct?

6    A.   That's correct.

7    Q.   Are you aware that if the government chooses to, after

8    your participation in this trial and in any others related

9    to this crime, that they can move the Court to resentence

10   you?

11   A.   Yes.

12   Q.   In other words, they could ask the Court to set aside

13   your life sentence and give you something less, correct?

14   A.   Correct.

15   Q.   You would very much like to have that happen, wouldn't

16   you?

17   A.   Yes.

18   Q.   Now, when Anna Mae Aquash was up on that hill in that

19   field, she started to pray.  John Boy Graham -- she started

20   to pray, right?

21   A.   Yes.

22   Q.   She started to pray out loud, correct?

23   A.   I heard what seemed like praying in her language.  I

24   could not understand.  And she was standing; she was never

25   kneeling; she was never kneeling and begging.

1    Q.   I didn't ask you whether she was kneeling.  I asked

2    you whether she was praying?

3    A.   Yes, she was praying.

4    Q.   And you could hear her praying, right?

5    A.   Yes.

6    Q.   Seemed to be praying because of her emotionalism at

7    the time, right, and way she was looking up into the sky?

8    A.   I can't remember if she was looking up in the sky.

9    Q.   Why do you think she was praying?

10   A.   Maybe she knew what was going to happen.

11   Q.   Maybe she knew.  Did you think maybe she knew what was

12   going to happen when John guy Graham put a gun to her head?

13   A.   Yes.

14   Q.   He put a gun to her head and then she started praying,

15   right?

16   A.   I don't know how it came about, but he shot her.

17   Q.   While she was praying, right?

18   A.   Yes.

19   Q.   You are right next to them when that happened,

20   correct?

21   A.   I was not right next to him.

22   Q.   You were about from where you are over to where that

23   door is, is that your testimony?

24   A.   Maybe from here to where you are standing.

25   Q.   20 feet or so?

1    A.    Yes.

2    Q.    And she fell, didn't she?

3    A.    Yes.

4    Q.    And you didn't say anything at all, did you?

5    A.    No.

6    Q.    You got in the car, buried the gun, and you drove back

7    to Denver, right?

8    A.    Yes.

9    Q.    And that night you stayed at the apartment where John

10   Boy Graham lived and with Angie Begay, right?

11   A.    Yes.

12   Q.    You weren't afraid he was going to shoot you, were

13   you?

14   A.    Not after he handed me the gun.

15   Q.    You handed the gun back to him, didn't you?  Isn't

16   that what you told the jury?

17   A.    That's right.

18   Q.    Mr. Looking Cloud, what is your real name?  Is it

19   Fritz Arlo Looking Cloud?

20   A.    Could be.

21   Q.    Your legal name is Fritz Arlo Looking Cloud, isn't it?

22   A.    Yes.

23   Q.    At various times when you have been arrested by the

24   police, have you also told them your name is Roger Frank

25   Bear, Leon Brewer, Steve Cloud, Jessie Cloud, Jessie Iron

1    Owl, Jessie Iron Shell, Steven Randall, and Jerry Spider?

2    A.   Yes.

3    Q.   So you have lied to police officers about things as

4    basic as your name on many, many occasions, haven't you?

5    A.   Yes.

6         MR. HANNA:  No other questions.

7         THE COURT:  We will take a 15-minute recess now

8    and then come back.  Please stand for the jury.

9         (Recess taken.)

10        THE COURT:  Bring in the jury, please.

11        (Following proceedings in the presence of the

12   jury.)

13        THE COURT:  Proceed.

14        MR. MANDEL:  I believe the marshals are bringing

15   him in, Your Honor.

16        THE COURT:  Very well.

17                    **REDIRECT EXAMINATION**

18   BY MR. MANDEL:

19   Q.   Mr. Looking Cloud, you have been up there a long time,

20   haven't you?

21   A.   Yes, sir.

22   Q.   I will try and keep this brief.  When you were first

23   debriefed in 1994, you didn't make any mention of being at

24   Dick Marshall's in Allen, did you?

25   A.   There was no mention.

1    Q.   And the same thing is true in 2003, wasn't it?

2    A.   Yes.

3    Q.   I want to go back to 1975, sir.  At the time you went

4    to the defendant's house in Allen, did you know him at that

5    time?

6    A.   Yes.

7    Q.   Did you also know of him at that time; his reputation,

8    that is?

9    A.   Yes.

10   Q.   Were you afraid of him?

11   A.   Yes.

12   Q.   Can you tell us why, sir?

13            MR. HANNA:  There's evidence in the record.

14            THE COURT:  Just a moment. I am going to give the

15   jury a limiting instruction before any answer is given to

16   this question.  You recall other times I have given you

17   instructions that have been during the course of the trial.

18   This is a limiting instruction which means it limits the

19   use that you can make of certain evidence and it's going to

20   limit the use that you make of whatever answer Mr. Looking

21   Cloud makes to this question.  The evidence of some act or

22   reputation by Dick Marshall is allowed into evidence at

23   this point only for a very limited purpose.  That is, only

24   to show why Arlo Looking Cloud claims he was afraid of

25   Mr. Marshall and that was why he did not tell law

```
 1    enforcement of going to Dick Marshall's home in Allen,

 2    South Dakota.  It can be used only for that purpose and not

 3    for any other purpose.  You can ask the question.

 4    Q.   (BY MR. MANDEL)   Arlo, why are you afraid of him?

 5    A.   He was Russell Means' enforcer and he would confess to

 6    a murder and he was released.

 7              MR. HANNA:  Objection; move to strike; move for a

 8    mistrial; move for an instruction.

 9              THE COURT:  I have given a limiting instruction.

10    The objection is overruled.  Ask your next question.

11              MR. HANNA:  I made a motion for mistrial as well.

12              THE COURT:  We will take that up out of the

13    presence of the jury.

14              MR. HANNA:  Yes, sir.

15    Q.   (BY MR. MANDEL)   When you say he was Russell Means'

16    enforcer, what did you understand that to mean, sir?

17              MR. HANNA:  Objection.

18              THE COURT:  We will have hearing out of the

19    presence of the jury.  Ladies and gentlemen of the jury, we

20    are going to have a short hearing out of your presence.

21    Please stand for the jury.

22              (Following proceedings out of the presence of the

23    jury.)

24              THE COURT:  Please be seated.

25              (Following proceedings in the presence of the
```

1    jury.)

2         THE COURT:  I am going to give the jury another

3    limiting instruction with regard to how you consider

4    evidence you just heard.

5         What Arlo Looking Cloud claims as his two bases

6    for fear of Dick Marshall is his subjective state of mind.

7    Mr. Looking Cloud is testifying as to what he believes to

8    be the basis for him being afraid of Dick Marshall.  You

9    must not assume that the things Mr. Looking Cloud relied

10   upon were true, as that is not the issue under the limiting

11   instruction on the very limited use you could make of the

12   testimony you have heard just before the recess.  Both

13   bases for Mr. Looking Cloud's fear are simply what he

14   thought, whether those things he believed were in fact true

15   or not.  You must not assume that what Mr. Looking Cloud

16   believed to be a factual basis for his fear was true;

17   instead, you must determine whether his subjective claim of

18   fear of Dick Marshall was true and the reason did he not

19   tell law enforcement of going to Dick Marshall's house in

20   Allen, South Dakota.  You may proceed.

21        MR. MANDEL:  Thank you, Your Honor.

22   Q.   (BY MR. MANDEL)   Arlo, in 2008, did you make a

23   decision to come forward and cooperate with the United

24   States?

25   A.   Yes.

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    Q.   Who did you come forward to first regarding the

2    details of what you knew?

3    A.   My attorney, Barry Bachrach.

4    Q.   Do you recall about when that was?

5    A.   In April, I am not sure, '07, '08.

6    Q.   Arlo, what made you change your mind at that point?

7    A.   There were too many lies out there.

8    Q.   Was it your feeling that you wanted to set the record

9    straight in some fashion?

10          MR. HANNA:  Objection; leading.

11          THE COURT:  Yes.  Overruled.

12   A.   Yes, the truth.

13   Q.   (BY MR. MANDEL)  When you explained it to

14   Mr. Bachrach, did he then get in touch with the United

15   States to have you debriefed?

16   A.   Yes.

17   Q.   And what you laid out at that time is essentially the

18   same thing that you explained here today on your direct

19   examination?

20   A.   Yes.

21   Q.   You understand the seriousness of this proceeding,

22   don't you?

23   A.   Yes, I do.

24   Q.   Did anyone ever ask you or seek from you or suggest to

25   you that there was some interest regarding Richard

1    Marshall?

2    A.   I don't understand.

3    Q.   Did somebody ask you to testify as to what you

4    testified to here today?

5    A.   (No response.)

6    Q.   Did somebody try to put words in your mouth?

7    A.   No.

8    Q.   Is what you testified here to today the truth?

9    A.   Yes.

10        MR. MANDEL:  No further questions, Your Honor.

11                    **RECROSS-EXAMINATION**

12   BY MR. HANNA:

13   Q.   Mr. Looking Cloud, you just couldn't wait to bring

14   Russell Means' name into this trial, could you?

15        MR. MANDEL:  Your Honor, can we approach?

16        THE COURT:  Yes, you may.

17        (Bench conference on the record.)

18        MR. MANDEL:  Your Honor, am I precluded from

19   discussing this?

20        THE COURT:  Not now.

21        MR. MANDEL:  My only question.

22        (Bench conference concluded.).

23   Q.   (BY MR. HANNA)   I will repeat my question.  You just

24   could not wait to bring Russell Means' name into this

25   trial, could you?

                      JUDITH M. THOMPSON
                 (605) 348-8610     FAX  (605) 343-6842

```
 1    A.   No, ma'am -- sir.

 2    Q.   You have been sitting in your jail cell, in your

 3    prison cell figuring out how you were going to get Russell

 4    Means' name into this trial and get a little pay back,

 5    right?

 6    A.   No.

 7    Q.   Now you got away with murder for 28 years, didn't you,

 8    until you were arrested in 2003?

 9    A.   No.

10    Q.   Nobody arrested you for Anna Mae Aquash's murder until

11    2003, right?

12    A.   I did not kill no one.

13    Q.   You recall you were a free man in 1999.  Nobody had

14    arrested you in 1999 for Anna Mae Aquash's murder, had

15    they?

16    A.   No.

17    Q.   And Russell Means gave a press conference in Denver

18    naming you publically as one of the killers and kidnappers

19    of Anna Mae Aquash, didn't he?

20    A.   I don't know.  I never heard of it until later.

21    Q.   Yeah, you heard about it at some point, didn't you,

22    before you came in here?

23    A.   At some point, yes.

24    Q.   Uh-huh.  And you knew that Russell Means called the

25    press conference in Denver where he named you, Theda
```

1    Clarke, and John Boy Graham as the people who kidnapped and

2    murdered Anna Mae Aquash, right?

3    A.   I don't know that he mentioned any names; but, yes, he

4    did.  I recall that he did.

5    Q.   Somebody told you somewhere along the line that

6    Russell Means had a press conference and gave your name?

7    A.   That's right.

8    Q.   Right?

9    A.   Right.

10   Q.   And that caught a lot of attention; brought a lot of

11   attention to the case, didn't it?

12   A.   I have no idea.

13   Q.   You did get arrested about four years later for

14   murder, didn't you?

15   A.   Yes.

16   Q.   And you mentioned today -- maybe it was yesterday --

17   but you said that of the so-called national leaders of AIM,

18   Russell Means, Dennis Banks, Vernon and Clyde Bellecourt,

19   the only one you knew any is Vernon Bellecourt, right?

20   A.   Yes.

21   Q.   In fact, you told Kamook Banks Vernon Bellecourt gave

22   you acid and marijuana back in the day, right?

23   A.   I do not recall.

24   Q.   You do know Vernon Bellecourt?

25   A.   Yes, I do.

```
 1    Q.   And Vernon Bellecourt was basically the guy who put

 2    together Denver AIM, right?

 3    A.   Yes.

 4    Q.   Vernon Bellecourt's and people he's associated with

 5    helped you pay for your attorneys in this case?

 6    A.   No.

 7    Q.   Your attorney, Terry Gilbert, who did your appeal from

 8    Cleveland, who paid for him?

 9    A.   I have no idea.

10    Q.   You don't know who paid for your attorney, is that

11    right?

12    A.   That's correct.

13    Q.   Somebody paid him, but you don't know who it is,

14    right?

15    A.   Yes.

16    Q.   Who is picking up Barry Bachrach's -- from Boston --

17    fees and expenses?

18    A.   My family.

19    Q.   Now, at that conference, that press conference, were

20    you aware that Russell Means also named Vernon and Clyde

21    Bellecourt as the people inside the house in Rosebud who

22    participated in the decision and made the decision to

23    murder Anna Mae Aquash?

24    A.   I do not know what his statement was.

25    Q.   You do know that Vernon Bellecourt, the person who you
```

1    knew, was named as one of the people who gave the order to

2    kill Anna Mae Aquash?

3    A.   I was not at his conference, whatever it was.

4    Q.   Didn't somebody mention that to you at some point

5    before you testified here today?

6    A.   No.

7    Q.   Now, when you debriefed after you have decided you

8    wanted to clear everything up in 2008, you went there with

9    your attorney, Barry Bachrach from Boston, and you told

10   them basically pretty much the story you told the jury

11   here, right?

12   A.   Yes.

13   Q.   And at that time neither -- well, the people who were

14   there were Marty Jackley, United States Attorney for South

15   Dakota, right?  He was one of them?

16   A.   Yes.

17   Q.   Robert Mandel, Assistant United States Attorney for

18   South Dakota, right?

19   A.   Yes.

20   Q.   And Special Agent Michael McRoden of the FBI is

21   sitting here at this counsel table, right?

22   A.   Yes.

23   Q.   And you told them about Theda Clarke getting a gun

24   from Richard Marshall, right?

25   A.   That's correct.

1   Q.   And not one of them asked you anything at all about

2   how come you haven't said this at any time in the last many

3   years in which you have been speaking to law enforcement?

4   A.   Dick Marshall was released after.

5   Q.   I am asking you a question.

6        MR. HANNA:  Move to strike, Your Honor.

7        THE COURT:  Disregard the answer.

8   Q.   Answer the question that I put to you.  The question I

9   put to you is:  not one of those men asked you why you were

10  telling a new story that you never told before, did they?

11  A.   I don't know.

12  Q.   You know this:  on 2008, August 19, you didn't say

13  anything about:  Dick -- I was afraid to say anything about

14  Dick Marshall; that's why I didn't say anything.

15  A.   No.

16  Q.   You didn't say anything about that when you were

17  talking to them August 19, 2008, did you?

18  A.   I'm sorry?

19  Q.   You didn't say anything about:  I was afraid of Dick

20  Marshall in 1994, 1995 and 2003 and that's why I never said

21  that before?

22  A.   I do not recall.

23  Q.   You don't recall.  You don't recall anybody asking --

24  even asking you how come you are telling us a different

25  story; nobody even asked you that question, did they?

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    A.   I don't recall.

2    Q.   And you did not say, "You know, I have been so afraid

3    all these years of Dick Marshall so that's why I didn't say

4    anything?"

5    A.   I believe I did at one point.

6    Q.   It's not reflected -- you know it's not reflected in

7    any report?

8    A.   I'd like to see the reports.

9    Q.   You want to try to remember what you said before?

10   A.   Exactly.

11   Q.   It's hard to keep a story straight when you are always

12   having to remember what you said before, isn't it?

13   A.   I know the truth.

14   Q.   You never mentioned anything at all about:  I didn't

15   say this before because Dick Marshall was an enforcer for

16   Russell Means, did you?

17   A.   I never said before, but I did say it in '08.

18   Q.   You never said that in '08 to the United States

19   Attorney when they questioned you?

20   A.   I believe I did.

21   Q.   When you were testifying in the grand jury -- you

22   testified in two grand juries since August 19, 2008, right?

23   A.   Correct.

24   Q.   You testified in a grand jury the next day on August

25   20, 2008, right?

1   A.   That's right.

2   Q.   You didn't say anything then about:  I am telling you

3   a different story now because I was afraid of Dick Marshall

4   all those years, did you?

5   A.   No, I was never asked, but I did give the truth.

6   Q.   Now, in 1994, that was 19 years after what happened in

7   1975, right?

8   A.   Right.

9   Q.   Now, by the way, the last time since 1975 when you

10  went to Allen, South Dakota one night with Anna Mae Aquash

11  the next time you saw Dick Marshall was yesterday in this

12  courtroom, right?

13  A.   Correct.

14  Q.   And so 19 years after you last saw Dick Marshall in

15  1975 and you talked to investigators in 1994, you were

16  still afraid of Dick Marshall, is that right?

17  A.   I knew of him because he'd been paroled after he

18  confessed after seven years.

19  Q.   You knew that Richard Marshall --

20  A.   He was out, yes.

21  Q.   You knew that Richard Marshall was convicted after a

22  trial for shooting a man in a bar in 1975, right?

23  A.   That's right.

24  Q.   Now, in 1994 and in 1995 and in 2003, you had done

25  time in prison, right?

1    A.   In 2003, yes.

2    Q.   You had been surrounded by rough and dangerous men,

3    right?

4    A.   Correct.

5    Q.   And today you told us when you are in prison you are

6    not afraid of the Arian Brotherhood, you are not afraid of

7    the  Latin Kings, you are not afraid of the Mexican Mafia,

8    you are not afraid of the Bloods and the Cripts, but you

9    were afraid of Richard Marshall and Charlie Abourezk,

10   right?

11   A.   Correct.

12          MR. HANNA:  No other questions.

13   A.   When I --

14          MR. HANNA:  No other questions.  You are done.

15          MR. MANDEL:  Your Honor, I ask if we can approach

16   again before I start?

17          THE COURT:  You may.

18          (Bench conference on the record.)

19                **FURTHER REDIRECT EXAMINATION**

20   BY MR. MANDEL:

21   Q.   Arlo, I want to go back again to 1975 when you were at

22   Richard Marshall's house.

23          MR. HANNA:  I object.

24          MR. MANDEL:  There was an objection, Your Honor.

25          THE COURT:  I didn't her it.

```
 1            MR. HANNA:  Object; beyond the scope.
 2            THE COURT:  I think it's proper indirect; we will
 3   see, though.  I am going to overrule it.  I think it's
 4   preparatory; if it's not, it will be apparent it's not.
 5   Overruled.
 6   Q.  (BY MR. MANDEL)   Were you fearful of Mr. Marshall at
 7   that time?
 8   A.  No.
 9   Q.  You were at his house; you were not fearful?
10   A.  No.
11   Q.  Were you aware of his reputation?
12            MR. HANNA:  Objection.
13            THE COURT:  Overruled.
14   A.  Yes.
15   Q.  (BY MR. MANDEL)   What did you understand that to be,
16   sir?
17            MR. HANNA:  Objection.
18            THE COURT:  Overruled.
19   A.  As an enforcer.
20   Q.  (BY MR. MANDEL)   You said earlier, for Russell Means?
21   A.  Yes, sir.
22   Q.  Well, when you say that, what do you mean by that?
23   A.  He was Russell Means' gun man.
24            MR. HANNA:  Objection; move for a mistrial.
25            THE COURT:  Overruled.  Once again, keep in mind
```

1    this isn't being received as I just told you for whether or

2    not this is true or not, this is just what Mr. Looking

3    Cloud believed -- claims to believed as the basis for his

4    claim of fear of Mr. Marshall.  Overruled, with that

5    limiting instruction.

6    Q.   (BY MR. MANDEL)   Why did you believe that, sir?

7              MR. HANNA:  Objection.

8    A.   It's been common knowledge in the named community.

9              THE COURT:  Just a moment.  Overruled.  Now, the

10   answer is partially in, granted, answer is stricken.

11   Disregard the answer and ask your next question.

12   Q.   (BY MR. MANDEL)   I didn't even hear the answer.

13             THE COURT:  You don't have to worry about it

14   because I struck it.

15             MR. MANDEL:  I am not sure what I'm going to ask.

16   Q.   (BY MR. MANDEL)   Were you aware of a murder at that

17   time?

18   A.   I'm sorry, the question?

19   Q.   I said, were you aware of a murder that had taken

20   place at that time?

21   A.   Yes.

22   Q.   What murder was that, sir?

23   A.   The one in Scenic.

24   Q.   Do you remember the victim's name?

25   A.   Martin Montileaux.

```
 1              MR. HANNA:  Objection; irrelevant.

 2              THE COURT:  Overruled.

 3   Q.   (BY MR. MANDEL)  Go ahead.

 4   A.   Martin Montileaux.

 5   Q.   Was he a relation of yours?

 6   A.   No.

 7   Q.   Were you aware of charges being filed against

 8   Mr. Marshall in that case?

 9   A.   Yes.

10   Q.   Did that have any effect at that time in 1975 knowing

11   that?

12   A.   Yes.

13   Q.   What was the effect, sir?

14   A.   I was being array (sic).   I didn't really know what

15   to think.

16   Q.   I couldn't hear that.

17   A.   I was array (sic).

18              COURT REPORTER:  You were what?

19   A.   I really didn't trust anyone.

20   Q.   You heard counsel for the defense ask you about your

21   awareness of the conviction in that case?

22   A.   Yes.  I know that he confessed to the murder and he

23   was released right after he confessed.

24   Q.   But he was first convicted of it, was he not?

25   A.   Yes.
```

JUDITH M. THOMPSON
(605) 348-8610     FAX  (605) 343-6842

1    Q.   Did that have an effect regarding your -- the fact --

2    let me start over again.  As we talked about before, you

3    were interviewed by law enforcement in 1994 in Denver,

4    correct?

5    A.   Yes.

6    Q.   Did you at that time reveal that you had been to Mr.

7    Marshall's house in 1975?

8    A.   No.

9    Q.   Why not?

10   A.   He was released from prison and my family -- I was

11   fearful for my family.

12   Q.   Where does your family live, sir?

13   A.   My family is all over.

14   Q.   Do you have family members that live on Pine Ridge?

15   A.   Yes.

16   Q.   In terms of closer family members, how many, sir,

17   approximately?

18   A.   I can't say really.  500, maybe.

19   Q.   You live on the reservation; there's a lot of people

20   you feel you are related to?

21   A.   Yes.

22   Q.   How about your immediate family or grandparents,

23   things like that, how many are we talking about?

24   A.   I don't know.  50, maybe.  I don't know.  But I was

25   worried for my father, yes.

1    Q.   Your father was kind of at the top?

2    A.   My father used to travel a lot and he was with a

3    treaty conference, so that placed him in close contact with

4    a lot of people that were within the movement.

5    Q.   In 2003, you were arrested on the charges you were

6    ultimately convicted of, correct?

7    A.   Correct.

8    Q.   And you saw the video today of your interview at that

9    time, correct?

10   A.   Correct.

11   Q.   At that time you didn't reveal that you had been to

12   Richard Marshall's house in Allen, did you?

13   A.   No.

14   Q.   Again, I will ask you why not?

15        MR. HANNA:  Objection; asked and answered.

16        THE COURT:  Overruled.

17   Q.   (BY MR. MANDEL)  Go ahead, Arlo.

18   A.   I was fearful for my family, my father.

19   Q.   Fearful of who?

20   A.   '94, yes.

21   Q.   Who were you fearful of, sir?

22   A.   My father -- Dick Marshall.

23        MR. MANDEL:  Your Honor, I have no further

24   questions.

25        THE COURT:  Redirect.

                    JUDITH M. THOMPSON
            (605) 348-8610     FAX  (605) 343-6842

1                     **FURTHER RECROSS-EXAMINATION**

2      BY MR. HANNA:

3       Q.    Your father's name is John Looking Cloud, right?

4       A.    Yes.

5       Q.    What year did he die?

6       A.    2001.

7       Q.    Two years before you spoke to police officers on 2003,

8      right?

9       A.    Yes.

10                 MR. HANNA:  No other questions.

11                 THE COURT:  Anything further?

12                 MR. MANDEL:  No, Your Honor.

13                 THE COURT:  Thank you.  You may step down.  Call

14     your next witness.

15                 (End of partial transcript.)

16                      I N D E X

17                      WITNESSES

18     FOR THE GOVERNMENT:

19     ARLO LOOKING CLOUD                     PAGE
            Direct Examination by Mr. Mandel     2
20          Cross-Examination by Mr. Hanna      55
            Redirect Examination by Mr. Mandel  158
21          Recross-Examination by Mr. Hanna    163
            Further Redirect Exam by Mr. Mandel 171
22          Further Recross-Exam by Mr. Hanna   177

23

24

25

                          JUDITH M. THOMPSON
                 (605) 348-8610     FAX  (605) 343-6842

1                    COURT REPORTER'S CERTIFICATE

STATE OF SOUTH DAKOTA  )

2                           SS

COUNTY OF PENNINGTON   )

3

4        I, Judith M. Thompson, R.P.R., Official Court Reporter in

5   and for the United States District Court, District of South

6   Dakota,

7        DO HEREBY CERTIFY that I acted as such Court Reporter at

8   the Jury Trial of the within-entitled action, and that the

9   foregoing partial transcript, pages 1 to 177, inclusive, is a

10  true and complete transcript of my shorthand notes taken at

11  said Jury Trial.

12       Dated at Rapid City, South Dakota, this 20th day of April,

13  2010.

14

15

16                                /s/

17                    _____

                     Judith M. Thompson, R.P.R.
                     Official Court Reporter
18

19

20

21

22

23

24

25